# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### May 8, 2012 Session

## RONDAL AKERS ET AL. v. PRIME SUCCESSION OF TENNESSEE, INC. ET AL.

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Circuit Court for Bradley County**
No. V-02-623     William Neil Thomas III, Judge, sitting by interchange

---

**No. E2009-02203-SC-R11-CV - Filed September 21, 2012**

---

Dr. Rondal D. Akers, Jr. and Lucinda Akers sued T. Ray Brent Marsh for the alleged mishandling of their deceased son's body, which had been sent to Mr. Marsh's crematorium for cremation. Following a jury verdict for the Akerses, the trial court entered judgment against Mr. Marsh based on the intentional infliction of emotional distress claim but granted his motion for a judgment notwithstanding the verdict on the Akerses' Tennessee Consumer Protection Act ("TCPA") and bailment claims. The Court of Appeals affirmed. We hold the trial court did not err in (1) holding Mr. Marsh liable for intentional infliction of emotional distress in the amount of the jury verdict; (2) instructing the jury that they were permitted to draw a negative inference resulting from Mr. Marsh's invocation of his Fifth Amendment privilege during questioning; and (3) dismissing the TCPA and bailment claims. The judgments of the trial court and the Court of Appeals are affirmed.

### Tenn. R. App. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed

SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

William J. Brown, Cleveland, Tennessee, for the appellants, Rondal Akers, Jr. and Lucinda Akers.

Stuart F. James, Chattanooga, Tennessee, for the appellee, T. Ray Brent Marsh.

**OPINION**

**I. Factual and Procedural Background**

Rondal Douglas Akers III (the "Deceased") died at the age of thirty-four on November 23, 2001, following a brief illness. His parents, Dr. Rondal D. Akers, Jr., and Lucinda Akers, made funeral arrangements with Buckner-Rush Funeral Home in Cleveland, Tennessee. Although Dr. and Mrs. Akers were opposed to having their son's body cremated, they authorized and arranged for the cremation in accordance with his expressed wishes. After their son's funeral service, his body was transported to Tri-State Crematory in Noble, Georgia, for cremation. Later, the Akerses received what was purported to be their son's cremains (the "Cremains").

Subsequently, it was discovered that Mr. Marsh had not been cremating bodies that were sent to Tri-State for cremation, but rather burying or dumping the bodies in various places on the Tri-State property. The Georgia Bureau of Investigation ("GBI") began an investigation in February 2002. The investigation soon turned into a massive search and recovery effort by the GBI and numerous other governmental agencies that lasted roughly three months. Agent Greg Ramey, the lead criminal investigator for the GBI, testified that about 100 GBI agents from around the state were assigned to work on the Tri-State case in rotating shifts and that approximately fifteen other agencies assisted in the search and recovery effort.

From the Tri-State property, authorities recovered bodies and body parts of over 320 persons, in widely varying stages of decay. Some were buried in shallow graves. Some had been dumped in surface trash pits. Human remains and bodies were found in virtually every building on the property. A body was found in a hearse, another in a van, and a partially mummified corpse of a man in a suit was discovered in a box. Some of the bodies recovered had been partially cremated, some were without arms and legs, and some had their extremities burned away. An unburned corpse was laying in the crematory's retort.[1]

The GBI's efforts to find all the bodies at Tri-State were extensive. All of the trees on the roughly sixteen-acre property were cut down, and bulldozers were used to remove the top two or three inches of soil. A lake on the property was drained and the bottom dredged with heavy machinery. Agent Ramey testified that "every inch" of the property was carefully searched. Other property that was nearby or adjacent to Tri-State property was also inspected. Agent Ramey testified that he was absolutely confident that all of the bodies that were on the Tri-State property had been recovered. Deceased's body was never found, and

---

[1] The crematory oven is called a "retort."

the GBI's search and recovery effort yielded no clue as to what actually happened to his body.

After the Akerses learned about the problems at Tri-State, they took the box containing their son's "cremains" to the GBI and were told that the box contained potting soil and cement. The Akerses suffered under this misconception from 2002 until September 2008 when they learned that the box contained human cremains.[2]

The Tri-State Crematory investigation produced criminal and civil litigation in Tennessee and Georgia. Mr. Marsh was indicted and pleaded guilty to multiple criminal charges in Georgia and Tennessee stemming from his operation of Tri-State. He was incarcerated in Georgia at the time of trial of this action.[3] The investigation also spawned civil litigation against Tri-State, Mr. Marsh, and other parties.[4]

On July 26, 2002, the Akerses sued Mr. Marsh.[5] The complaint alleged causes of action for "breach of bailment responsibility"; violations of the TCPA; "outrageous conduct"; fraud and/or negligent misrepresentation; and "intentional/negligent infliction of emotional distress." The case against Mr. Marsh proceeded to trial before a jury.

---

[2] All of the experts testified that the box provided to the Akerses contained human remains, although no expert could definitively determine whether the Cremains were or were not those of Deceased.

[3] Mr. Marsh "ple[aded] guilty in Georgia to multiple felonies including 122 counts of burial service fraud, 47 counts of false statement, 179 counts of abuse of a dead body, and over 400 counts of criminal intent theft by taking." Akers v. Prime Succession of Tenn., Inc., No. E2009-02203-COA-R3-CV, 2011 WL 4908396, at *3 (Tenn. Ct. App. Oct. 17, 2011). Mr. Marsh was sentenced in Georgia to twelve years in prison, a concurrent term of seventy-five years of probation, payment of a $20,000 fine, and a requirement that he send handwritten letters of apology to his victims. Id., quoting Floyd v. Prime Succession of Tenn., Inc., No. E2006-01085-R9-CV, 2007 WL 2297810, at *3 (Tenn. Ct. App. Aug. 13, 2007). In 2005, Mr. Marsh pleaded guilty in Tennessee to one count of theft of services between $1,000 and $10,000, seven counts of criminal simulation, and thirty-five counts of abuse of a corpse. See Floyd, 2007 WL 2297810, at *3. Mr. Marsh received a nine-year sentence in Tennessee, to be served concurrently with the Georgia sentence. Id.

[4] See Akers v. Buckner-Rush Enters., Inc., 270 S.W.3d 67 (Tenn. Ct. App. 2007); Crawford v. J. Avery Bryan Funeral Home, Inc., 253 S.W.3d 149 (Tenn. Ct. App. 2007); Floyd, 2007 WL 2297810; see also Note, Keith E. Horton, Who's Watching the Cryptkeeper?: The Need for Regulation and Oversight in the Crematory Industry, 11 Elder L.J. 425, 438-39 (2003).

[5] The Akerses also sued Tri-State Crematory, Inc. and Buckner-Rush Funeral Home and its corporate owners, Prime Succession of Tennessee, Inc., Buckner-Rush Enterprises, Inc., and Prime Succession Holding, Inc. The Akerses eventually settled with and dismissed their claims against the funeral home defendants and nonsuited their claims against Tri-State Crematory.

Dr. Hugh E. Berryman, a board-certified forensic anthropologist, testified as an expert witness for Mr. Marsh. Dr. Berryman, who examined and analyzed the Cremains, testified that several foreign metal items were found in the Cremains. One of the items was a metal stud bearing the inscription "Backyard Blue" from a pair of denim blue jeans. Deceased, however, was not wearing blue jeans when he was sent to Tri-State for cremation. There were also several pieces of fine wire that appeared to be from a mechanical device or a surgical procedure, and that Dr. Berryman characterized as "sternal chest wire" that was "very likely from a surgery." Deceased did not have wire from a mechanical device or a surgical procedure on or in his body. When asked whether he found "commingling in the Akers reported cremains," Dr. Berryman replied, "from what I know of Rondal Akers, I found some things in those cremains that didn't belong in there." Dr. Berryman testified that no scientific test exists to determine whether the Cremains delivered to the Akerses are those of Deceased or of someone else.

Dr. Berryman also closely examined the retort at Tri-State and testified that it was in such bad condition that he was surprised that it was operational. He described the floor of the retort as "in really bad shape," stating that "it had pockets, it had [fissures] running through it, and some of the [fissures] were two inches deep. It was . . . just amazing, the floor, it was in terrible shape." Dr. Berryman testified that the tools used at Tri-State to remove the cremains "look[ed] very primitive;" one was "like a hoe" with an eight-foot handle. Dr. Berryman further stated:

> I remember . . . looking at all the fissures and dips and holes and things that are in that retort floor and all the bones that were left behind and other metal and materials that were left in there, and I remember just making the comment . . . I don't see how you take one set of cremains out of there without leaving part of it behind and without mixing some of the others that had been there before with that one.

He spent several days inside the retort, excavating it like an archaeological site, because he "wanted to see how much material and where it is, how much material is left behind. And the thing that was shocking to me is how much actually was left behind." The retort floor was stratified. On the top layer of loose dust and sand that Dr. Berryman could move with a brush, he found sixty-nine items on the surface, including teeth, bone fragments, and metal items. Beneath the layer of loose material, Dr. Berryman found a moist layer that he could move with a trowel. He testified that this layer "had a lot of moisture in it, and it was . . . basically from body fat over the years." When Dr. Berryman was asked how many peoples' remains had been left in the retort, he replied, "I couldn't tell you how many individuals are there. I can tell you there's a minimum number of two, but could be a lot more than that, and I suspect there are."

As a part of his work on the case, Dr. Berryman visited the East Tennessee Crematorium Company in Maryville, Tennessee, to see how a quality crematorium was operated so he could compare it with Tri-State's operation. At the East Tennessee Crematorium, the floor of the retort was smooth and solid. The floor was swept clean of the cremains after a cremation, and Dr. Berryman did not see any commingling of materials with the cremains.

Following the close of proof and deliberations, the jury returned its verdict on the written verdict form, answering "YES" to the following questions: "(1) Did Brent Marsh intentionally inflict emotional distress or outrageous conduct upon the plaintiffs? (2) Did Brent Marsh violate the Tennessee Consumer Protection Act? (3) Did Brent Marsh violate a bailment responsibility with the plaintiffs?" The jury awarded Dr. Akers compensatory damages in the amount of $275,000, and Mrs. Akers compensatory damages in the amount of $475,000. The trial court entered judgment on the jury verdict.

Mr. Marsh filed a post-trial motion for judgment notwithstanding the verdict ("JNOV") or for a new trial. The Akerses filed a motion requesting the trial court to award treble damages and attorney's fees under the TCPA. After a hearing, the trial court granted Mr. Marsh a partial JNOV on the bailment and TCPA claims, dismissed those claims, and denied Mr. Marsh's motion for a JNOV or for a new trial on the intentional infliction of emotional distress claim. The Court of Appeals affirmed the trial court's judgment. Akers, 2011 WL 4908396, at *1.

Both Mr. Marsh and the Akerses filed applications for permission to appeal. We granted both applications and address the following issues: (1) whether the trial court erred in denying Mr. Marsh's motion for a JNOV or for a new trial on the intentional infliction of emotional distress claim; (2) whether the trial court erred in instructing the jury that they were permitted to draw a negative inference from Mr. Marsh's invocation of his Fifth Amendment privilege in response to certain questions asked of him during his deposition; (3) whether the trial court erred in granting Mr. Marsh a JNOV and dismissing the TPCA claim; and (4) whether the trial court erred in granting Mr. Marsh a JNOV and dismissing the Akerses' bailment claim.

The issues raised, with the exception of our review of the jury verdict, present questions of law, which we review de novo with no presumption of correctness. Mitchell v. Fayetteville Pub. Utils., 368 S.W.3d 442, 448 (Tenn. 2012). "Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). In determining whether "there is material evidence to support the jury verdict, we 'take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences to

sustain the verdict, and discard all countervailing evidence.'" Barkes v. River Park Hosp., Inc., 328 S.W.3d 829, 833 (Tenn. 2010) (quoting Whaley v. Perkins, 197 S.W.3d 665, 671 (Tenn. 2006)).

## II. Intentional Infliction of Emotional Distress

The legal argument supporting Mr. Marsh's assertion that the trial court should have granted his motion for a JNOV or for a new trial on the intentional infliction of emotional distress claim is a rather nuanced one. Mr. Marsh argues that in Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville, 154 S.W.3d 22 (Tenn. 2005), this Court effectively created two separate causes of action for the infliction of emotional distress—one for intentional infliction and another for reckless infliction. Because the Akerses did not specifically allege a claim for "reckless infliction of emotional distress," Mr. Marsh argues that they should be precluded from recovery based on a theory of reckless infliction. It follows, according to this argument, that proof presented by the Akerses from which the jury could have concluded that Mr. Marsh acted recklessly in inflicting emotional distress should be held insufficient because the plaintiffs did not specifically allege reckless infliction of emotional distress but only intentional infliction of emotional distress. We disagree with this argument.[6]

In Rogers v. Louisville Land Co., 367 S.W.3d 196 (Tenn. 2012),[7] we reviewed the tort of intentional infliction of emotional distress and reaffirmed that the "elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) *intentional or reckless*, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." Id. at 205 (emphasis added). We further observed as follows in Rogers:

---

[6] Mr. Marsh also argues that in order to recover for intentional infliction of emotional distress, a plaintiff must prove that the defendant's conduct was specifically directed at the plaintiff. In his brief, Mr. Marsh asserts that because "the jury instruction did not include all of the elements of intentional infliction of emotional distress, and omitted the crucial element that the intentional infliction of emotional distress has to be directed [at] a particular party, a logical conclusion that can be reached from the Doe decision," the jury instruction was fatally flawed and the case must be remanded for new trial. This Court in Doe 1 rejected the "directed-at" requirement for reckless infliction of emotional distress claims such as the one presented in this appeal. See Doe 1, 154 S.W.3d at 41-42. Because we hold that the Akerses may recover based on a showing of reckless conduct and that there is material evidence supporting the jury verdict on this element, we do not reach this argument.

[7] In fairness to Mr. Marsh and his counsel, it must be noted that his appellate brief was prepared and filed before this Court released its opinion in Rogers.

Since Doe 1 was decided, there has been some confusion and inconsistency regarding whether "reckless infliction of emotional distress" is a separate and distinct tort from intentional infliction of emotional distress. . . . [We have] observed numerous times that intentional infliction of emotional distress can be proven by a showing of either reckless or intentional behavior. This approach is consistent with the Restatement (Second) of Torts and the Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 45 (Tentative Draft No. 5, 2007). Although Doe 1 makes it clear that the analysis differs somewhat when the claimant alleges reckless conduct, it does not expressly hold that reckless infliction of emotional distress is a separate tort.

Id. at 205 n.6 (internal citations omitted); see also Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004) ("To state a claim for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant's conduct was *intentional or reckless* . . . .") (emphasis added)); Leach v. Taylor, 124 S.W.3d 87, 91-92 (Tenn. 2004) (noting that the first element of prima facie showing of intentional infliction of emotional distress is "the conduct complained of must be *intentional or reckless*" (emphasis added) (quoting Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997))); Miller v. Willbanks, 8 S.W.3d 607, 612 (Tenn. 1999); Medlin v. Allied Inv. Co., 398 S.W.2d 270, 274 (Tenn. 1966) (abrogated on other grounds by Camper v. Minor, 915 S.W.2d 437, 444 (Tenn. 1996)); Restatement (Second) of Torts § 46 (1965) ("One who by extreme and outrageous conduct intentionally *or recklessly* causes severe emotional distress to another is subject to liability for such emotional distress . . . .") (emphasis added); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 45 cmt. g (Tentative Draft No. 5, 2007) ("Courts uniformly hold that reckless conduct, not just intentional conduct, can support a claim for intentional infliction of emotional disturbance."); John J. Kircher, The Four Faces of Tort Law: Liability for Emotional Harm, 90 Marq. L. Rev. 789, 799 (2007) ("[A]lthough the rule is dubbed 'Intentional Infliction,' recovery also will be allowed when the defendant's conduct is not intended to cause emotional distress, but the defendant is merely reckless in doing so.").

The Akerses are not precluded from recovery because they did not specifically allege reckless infliction of emotional distress in their complaint. Because a claim for intentional infliction of emotional distress can be proven by a showing that a defendant acted recklessly, and the Akerses asserted a claim for intentional infliction of emotional distress, the trial court did not err in allowing the claim to go to the jury and entering judgment on the jury verdict.

The trial court instructed the jury as follows:

Normally, the law does not permit the recovery of damages for emotional distress unless the emotional distress is severe. A plaintiff is entitled to

recover damages for severe emotional distress: (1) actually and proximately caused by the extreme and outrageous conduct of another; and (2) done either with a specific intent to cause emotional distress *or with reckless disregard of the probability of causing that distress*.

(Emphasis added). This instruction closely tracks the current Tennessee pattern jury instruction on intentional infliction of emotional distress, T.P.I.–Civil 4.35 (2011). In Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992), this Court defined "reckless conduct" as occurring "when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." In future cases, if a claim of intentional infliction of emotional distress based on reckless conduct is tried to a jury, it would be helpful for the trial court to include a jury instruction defining "recklessness." Nevertheless, the jury here was instructed that the plaintiffs could recover if they proved the defendant acted with reckless disregard of the probability that his outrageous conduct would cause severe emotional distress, and consequently the failure of the trial court to specifically define "recklessness" in its instructions is not fatal to the jury verdict.

Mr. Marsh also complains that in the written jury verdict form, the question was phrased as "Did Brent Marsh intentionally inflict emotional distress or outrageous conduct upon the plaintiffs?" We agree that the verdict form is not perfect in that it would have been preferable to have omitted the term "outrageous conduct" on the form. In Rogers, this Court retired the use of the name "outrageous conduct" as a tort in Tennessee, explaining that

> [b]ecause having two names for the same tort—"intentional infliction of emotional distress" and "outrageous conduct"—engenders potential confusion and misunderstanding and may lead to error, courts and litigants should no longer refer to "outrageous conduct" as a separate, independent cause of action, nor as a synonym for the tort of intentional infliction of emotional distress.

Rogers, 367 S.W.3d at 205. The trial court in this case instructed the jury without the benefit of the Rogers decision, at a time when it was still common practice to refer to "intentional infliction of emotional distress" and "outrageous conduct" as "different names for the same tort." Lane v. Becker, 334 S.W.3d 756, 762 n.3 (Tenn. Ct. App. 2010). Furthermore, "[j]ury instructions are not measured against the standard of perfection." City of Johnson City v. Outdoor W., Inc., 947 S.W.2d 855, 858 (Tenn. Ct. App. 1996) (citing Grissom v. Metro. Gov't of Nashville, 817 S.W.2d 679, 685 (Tenn. Ct. App. 1991)). In addressing "whether a trial court committed prejudicial error in a jury instruction, [we] review the charge in its

-8-

entirety and consider it as a whole, and the instruction will not be invalidated if it 'fairly defines the legal issues involved in the case and does not mislead the jury.'" Nye v. Bayer Cropscience, Inc., 347 S.W.3d 686, 699 (Tenn. 2011) (quoting Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 446 (Tenn. 1992)). The trial court's jury instructions as a whole are not misleading and easily meet this standard.

We have carefully reviewed the record in this case and find there is sufficient material evidence of Mr. Marsh's reckless conduct to support the jury verdict imposing liability for intentional infliction of emotional distress. The Akerses presented evidence showing that Mr. Marsh pleaded guilty to the felony of criminal simulation with regard to Deceased's body. The proof also demonstrates that Mr. Marsh routinely treated bodies sent to him for cremation in a disrespectful and inappropriate manner, dumping or improperly burying them instead of cremating them. When he did cremate them, it was done in an improper manner that resulted in substantial commingling of the cremains with the cremains of other bodies and other foreign items. We affirm the jury verdict for intentional infliction of emotional distress.

### III. Negative Inference Resulting from Assertion of Fifth Amendment Privilege

During his deposition, Mr. Marsh invoked his Fifth Amendment privilege in response to numerous questions asked by plaintiffs' counsel. The trial court allowed portions of Mr. Marsh's deposition to be read to the jury and played a videotape showing Mr. Marsh taking the Fifth Amendment in response to questioning. The trial court then instructed the jury as follows regarding negative inferences that might be drawn from Mr. Marsh's invocation of the Fifth Amendment privilege:

Mr. Marsh has taken the Fifth Amendment privilege against self-incrimination, and I instruct you that you have available to you the opportunity to weigh the Fifth Amendment response and to give the response a – what is known as a negative inference.

For example, if Mr. Marsh asserted the Fifth Amendment privilege in response to a particular question, you may infer that if he had answered the question the answer would have had a negative impact.

However, you are not required to give the negative inference to a particular answer, and let me tell you I have not given this instruction as to every response he made where he asserted the Fifth Amendment privilege. Not every such response where the Fifth Amendment is asserted

may be given a negative inference, only where I instruct you it may be given a negative inference.

Otherwise, I want you to give the response the weight you think it is entitled to. I want you to consider the response in the light of all the other evidence given in this case. Let me just emphasize that only when I instruct you that a negative inference may be given should that negative inference be given. Otherwise, just give it the weight you think it's entitled to.

The trial court further instructed the jury that it was permitted to draw a negative inference from Mr. Marsh's refusal to answer the question "Are [the Cremains] the cremains of Rondal Douglas Akers, III?" and "Isn't it true those are not the cremains of Rondal Akers, III?"[8]

Mr. Marsh makes two arguments supporting his assertion that the trial court committed reversible error in addressing his invocation of the Fifth Amendment Privilege. First, Mr. Marsh asserts that there was not sufficient corroborating independent evidence regarding the facts to which he refused to answer to allow for a negative inference instruction to be given to the jury. Second, he insists that it was error to allow questions and answers from Mr. Marsh's deposition to which no negative inference applied to be read to the jury.

The Fifth Amendment to the Constitution of the United States provides that no person shall "be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Federal courts have held that the Fifth Amendment's protections extend to any type of proceeding, including civil trials,[9] but only under "those circumstances in which the person invoking the privilege reasonably believes that his disclosures could be used in a criminal prosecution, or could lead to other evidence that could be used in that manner" or "where the disclosures would not be directly incriminating, but could provide an indirect link to incriminating evidence." Doe v. Glanzer, 232 F.3d 1258, 1263 (9th Cir. 2000); see Nat'l Acceptance Co. of Am. v. Bathalter, 705 F.2d 924, 926-27 (7th Cir. 1983); see generally Robert Heidt, The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases, 91 Yale L.J. 1062, 1065 (1982). Courts have further recognized that a party's invocation of the privilege may disadvantage the opposing party, and thus, in civil proceedings, where "the parties

---

[8] The trial court also allowed a negative inference to be drawn from Mr. Marsh's refusal to answer three questions regarding a notebook in which he had kept records of whose bodies Tri-State had received for cremation from various funeral homes.

[9] See Lefkowitz v. Turley, 414 U.S. 70, 77 (1973); Kastigar v. U.S., 406 U.S. 441, 444 (1972).

are on a somewhat equal footing, one party's assertion of his constitutional right should not obliterate another party's right to a fair proceeding." Serafino v. Hasbro, Inc., 82 F.3d 515, 518 (1st Cir. 1996); see SEC v. Graystone Nash, Inc., 25 F.3d 187, 190 (3rd Cir. 1994).

Given this tension between the rights of both parties in civil matters, the United States Supreme Court has ruled that the trier of fact may under certain circumstances be allowed to draw adverse inferences from a party's invocation of his Fifth Amendment privilege. Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); see Levine v. March, 266 S.W.3d 426, 442 (Tenn. Ct. App. 2007) ("[T]he majority of jurisdictions, including Tennessee, permit fact-finders to draw adverse inferences against parties who invoke their Fifth Amendment rights in a civil case."). In Baxter, the Supreme Court recognized "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them" and further observed that "aside from the privilege against compelled self-incrimination, the Court has consistently recognized that in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause." 425 U.S. at 318-19. However, "[t]he Baxter holding is not a blanket rule that allows adverse inferences to be drawn from invocations of the privilege against self-incrimination under all circumstances in the civil context." Doe, 232 F.3d at 1264. The Ninth Circuit in Doe elaborated further as follows:

> [L]ower courts interpreting Baxter have been uniform in suggesting that the key to the Baxter holding is that such adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer. Thus, an adverse inference can be drawn when silence is countered by *independent evidence* of the fact being questioned, but that same inference cannot be drawn when, for example, silence is the answer to an allegation contained in a complaint. In such instances, when there is no corroborating evidence to support the fact under inquiry, the proponent of the fact must come forward with evidence to support the allegation, otherwise no negative inference will be permitted.

Id. (internal citations omitted); see also Steppach v. Thomas, 346 S.W.3d 488, 521 (Tenn. Ct. App. 2011) (applying prevailing interpretation of Baxter as requiring corroborating independent evidence).

We agree with the standard adopted by the Doe court. Therefore, we hold that the trier of fact may draw a negative inference from a party's invocation of the Fifth Amendment privilege in a civil case only when there is independent evidence of the fact

to which a party refuses to answer by invoking his or her Fifth Amendment privilege. In instances when there is no corroborating evidence to support the fact under inquiry, no negative inference is permitted.

Mr. Marsh first argues that the Akerses produced no corroborating evidence that he mishandled Deceased's body, and thus the jury should not have been instructed that it could draw a negative inference from his invocation of his Fifth Amendment Privilege. Specifically, Mr. Marsh argues that evidence of the way in which he treated other bodies is not evidence of how he treated that of Deceased, and that his guilty plea of the offense of criminal simulation with regard to Deceased's body does not constitute corroborating evidence.

We agree with Mr. Marsh that evidence of mishandling and mistreatment of other bodies is insufficient corroborating evidence to alone support a negative inference instruction. Courts have previously determined that for an adverse inference to be permitted, a plaintiff must present corroborating evidence regarding *the specific fact* to which the defendant refuses to answer. Doe, 232 F.3d at 1264-65; Steppach, 346 S.W.3d at 521. In determining whether a negative inference is permissible, the privilege analysis is applied on a question-by-question basis, and "therefore . . . the privilege necessarily attaches *only to the question being asked and the information sought by that particular question*." Doe, 232 F.3d at 1265 (emphasis added). Here, Mr. Marsh was specifically questioned about his treatment of the body of Deceased. As pertinent to the Fifth Amendment analysis, he was not asked questions regarding his treatment of other corpses sent to Tri-State for cremation. Evidence of mishandling or failure to cremate *other* bodies, standing alone, is not relevant corroborating evidence to support the accusation that Mr. Marsh specifically mishandled Deceased's body.

Mr. Marsh's argument, however, fails because the Akerses produced other evidence that tends to show that the body of Deceased was mishandled and not properly cremated. For example, in a video recorded during the GBI investigation, Mr. Marsh pointed to a body on the floor of a building and identified it as "Akers." Although it was later proved that the body was not that of Deceased, the video evidence indicates that Mr. Marsh believed he did not fully cremate Deceased's body. Even if Deceased was in fact cremated, the evidence established that the cremation did not comply with either industry standards or any reasonable notion of common decency and respect for the dead and the living who have lost a loved one. The evidence shows that cremation was done in a wholly improper and inappropriate manner using a retort that was in poor condition which could only result in substantial commingling with the cremains of previously cremated bodies and adulteration from other foreign materials. Furthermore, the testimony of Dr. Berryman established that metal objects were found in the Cremains that did not belong

to Deceased, including a wire from a mechanical device or a surgical procedure and a rivet from a pair of jeans. Expert testimony proved that the Cremains were returned to the Akerses in a commingled and adulterated condition. We believe that the foregoing is sufficient corroborating evidence that, if Deceased was cremated, Mr. Marsh mishandled the body of Deceased during the cremation.

Mr. Marsh further argues that his guilty plea to the felony of criminal simulation[10] with regard to Deceased's body should not be used as independent evidence. In Grange Mutual Casualty Co. v. Walker, 652 S.W.2d 908, 910 (Tenn. Ct. App. 1983) the court stated that "[a] plea of guilty . . . is generally not conclusive on the issues in a subsequent civil action, *but is competent evidence as an admission against interest*." (Emphasis added) (citations omitted). Even if the guilty plea is not conclusive as to liability, it constitutes independent evidence that supports the contention that Mr. Marsh mishandled Deceased's body. We conclude that the Akerses presented sufficient independent evidence regarding the mistreatment of Deceased's body to permit the jury to draw an adverse inference regarding the questions at issue.

Mr. Marsh's second argument insists that the trial court erred in allowing the Akerses' attorney to read questions and answers to the jury from Mr. Marsh's deposition testimony to which no negative inference applied. However, before permitting the deposition testimony to be read to the jury, the trial court informed counsel that it would instruct the jury as to which specific questions it could give a negative inference. For the remaining questions, the jury would be (and was) specifically instructed to give the response the weight to which the jury determined the response was entitled. Counsel for Mr. Marsh responded to the trial court: "That cures the problem, Your Honor. Thank you. I just wanted to make sure."

---

[10] Mr. Marsh pleaded guilty to the offense of criminal simulation specifically as a result of his treatment of Deceased's body. At the time of the offense, criminal simulation was defined at Tennessee Code Annotated section 39-14-115 (1989) as follows:

> (a) A person commits an offense of criminal simulation who:
> (1) With intent to defraud or harm another:
> (A) Makes or alters an object, in whole or in part, so that it appears to have value because of age, antiquity, rarity, source, or authorship that it does not have;
> (B) Possesses an object so made or altered, with intent to sell, pass, or otherwise utter it; or
> (C) Authenticates or certifies an object so made or altered as genuine or as different from what it is; or
> . . . .
> (c) Criminal simulation is punishable as theft pursuant to § 39-14-105, but in no event shall criminal simulation be less than a Class E felony.

By withdrawing his objection and approving the trial court's proposed instruction as "cur[ing] the problem," Mr. Marsh has waived this issue on appeal. Tennessee Rule of Appellate Procedure 36(a) provides that a party is not entitled to relief if that party is "responsible for an error or . . . failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. Rule App. P. 36(a). "It is an elementary principle of law that a party may not register an objection, later withdraw that objection, and subsequently raise the issue post-trial." State v. Garrin, No. 02C01-9501-CR-00028, 1996 WL 275034 at *5 (Tenn. Ct. Crim. App. May 24, 1996). Therefore, Mr. Marsh's second argument regarding his Fifth Amendment Privilege also fails.

### IV. Tennessee Consumer Protection Act Claim

The Akerses argue that the trial court erred by granting Mr. Marsh a JNOV and dismissing their claim alleging violation of the TCPA, Tennessee Code Annotated sections 47-18-101 to -2704 (2001 & Supp. 2011). Mr. Marsh argues that the TCPA does not provide a cause of action when the alleged damages suffered are for emotional distress without any economic or pecuniary loss. We agree with Mr. Marsh and hold that an action does not lie under the TCPA for emotional distress in the absence of pecuniary damages.[11]

A motion for "judgment notwithstanding the verdict" is governed by Tennessee Rule of Civil Procedure 50.02, which terms such a motion as one for directed verdict[12] and provides in pertinent part:

> Within 30 days after the entry of judgment a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict . . . . If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed.

---

[11] The issue of whether a plaintiff may recover under the TCPA for non-economic damages such as pain and suffering and emotional distress *in addition to* economic damages is not presented here, and we do not express an opinion on that issue in the present case.

[12] We have observed that "Rule 50.02 does not use the term 'judgment notwithstanding the verdict'; rather, it employs the term 'judgment entered in accordance with the motion for directed verdict.' There is no substantive difference between the terms, however[.]" Huskey v. Crisp, 865 S.W.2d 451, 453 n.1 (Tenn. 1993).

"In ruling on such a motion, the standard applied by both the trial court and the appellate court is the same as that applied to a motion for directed verdict made during trial." Mercer v. Vanderbilt Univ., Inc., 134 S.W.3d 121, 130 (Tenn. 2004). This standard requires the trial court and appellate courts to "take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion when there is any doubt as to the conclusions to be drawn from the evidence." Id. at 130-31. In this case, the trial court granted its JNOV based purely on conclusions of law; there is no factual issue. In Mercer, this Court observed that "when the jury's verdict rests upon an error of law, a party who has moved for a directed verdict may request the trial court to set aside the verdict and enter a judgment in accordance with the party's motion for directed verdict." Id. at 130.

At the time the complaint was filed, the TCPA, Tennessee Code Annotated section 47-18-109 (Supp. 2001), provided in pertinent part as follows:

> (a)(1) Any person who suffers *an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value* wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

(Emphasis added). Thus, the TCPA provides a cause of action for a plaintiff who has suffered an ascertainable loss of (1) money; (2) property; or (3) "any other article, commodity, or thing of value." See Discover Bank v. Morgan, 363 S.W.3d 479, 496 (Tenn. 2012) ("Once an ascertainable loss has been established, the TCPA allows consumers to recover 'actual damages.'"); Morrison v. Allen, 338 S.W.3d 417, 440 (Tenn. 2011) (holding no cause of action under TCPA resulting from plaintiffs' decision to allow insurance policy to lapse because the decision "does not constitute a 'loss of money or property'"); see also Wood v. Woodhaven Memory Gardens, Inc., 1991 WL 112273, at *5 (Tenn. Ct. App. June 27, 1991) (reversing award under TCPA where "the only damages claimed . . . are for emotional distress" resulting from cemetery's refusal to allow plaintiffs to place a full ledger memorial on their son's grave).

The TCPA does not provide a cause of action for purely emotional loss resulting from wrongful death. In Kirksey v. Overton Pub, Inc., 804 S.W.2d 68 (Tenn. Ct. App. 1990), the plaintiffs asserted a TCPA claim resulting from the alleged wrongful death of their son due to the defendant's deceptive acts. The Kirksey plaintiffs argued that the life of their son was a "thing of value" that they had lost, and therefore the TCPA provided

them a cause of action.  Id. at 73.  The Court of Appeals, ruling that the TCPA did not provide an action for purely emotional loss resulting from wrongful death, stated:

> Our interpretation of T.C.A. § 47-18-109 is that a person would be allowed to bring an action for loss of money or property as a result of unfair or deceptive acts.  We must hold that the General Assembly intended for the Consumer Protection Act to be used by a person claiming damages for an ascertainable loss of money or property due to an unfair or deceptive act or practice and not in a wrongful death action.

Id.

The Akerses have stated a claim for emotional loss and have not demonstrated that they have suffered an ascertainable loss of money, property, or any other article, commodity or tangible thing of value.[13]  Although a person's cremains have significant emotional and sentimental value, they do not have tangible economic value as required by the TCPA.  See generally Restatement (Second) of Torts § 869 cmt. a (1965) (noting that "the body ordinarily cannot be sold or transferred, has no utility and can be used only for the one purpose of internment or cremation").  Consequently, by the plain and unambiguous terms of the TCPA, that statute does not provide a cause of action for their recovery.  We affirm the judgment of the trial court granting Mr. Marsh a JNOV and dismissing the TCPA claim.

### V. Bailment Claim

We now turn to the issue of whether the trial court erred in granting Mr. Marsh a JNOV and dismissing the bailment claim.  The Akerses alleged that their delivery of Deceased's body to the funeral home "for the specific purpose of providing crematory services in a respectful and dignified manner" created a bailment relationship.

This Court has defined a bailment as "a delivery of personalty for a particular purpose or on mere deposit, on a contract express or implied; that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, or otherwise dealt with according to his direction or kept until he reclaims it."  Dispeker v. New S. Hotel Co., 373 S.W.2d 904, 908 (Tenn. 1963) (citing Breeden v. Elliot Bros., 118 S.W.2d 219, 219 (Tenn. 1937)).  Although bailments typically involve contractual agreements, an agreement is not always an indispensable element of a bailment relationship.  A bailment

_____

[13] Dr. Akers testified that Buckner-Rush funeral home ultimately did not charge the Akerses for the costs of Deceased's funeral and cremation.

relationship is generally founded on a contractual relation; however, "an actual contract or one implied in fact is not always necessary to create a bailment." Aegis Investigative Grp. v. Metro. Gov't. of Nashville & Davidson Cnty., 98 S.W.3d 159, 163 (Tenn. Ct. App. 2002). The Aegis court recognized a type of constructive or involuntary bailment, which arises by operation of law where (1) the person who has possession of a chattel holds it under such circumstances that the law imposes on him or her the obligation of delivering it to another; (2) a person has lawfully obtained possession of another's personal property by means other than a mutual contract of bailment; or (3) a person has lawfully acquired the possession of another person's chattel and holds it under circumstances whereby he or she should, on principles of justice, keep it safely and restore it or deliver it to the owner. Id.; see also Campbell v. State, 450 S.W.2d 795, 801 (Tenn. Crim. App. 1969) (holding that an actual contract or one implied in fact is not necessary to create a bailment when a person has lawfully acquired the personal property of another and holds it under circumstances whereby principles of justice dictate that the possessor keep it safe and restore it to the owner). The Court of Appeals ruled that the Akerses' bailment claim failed because the Akerses' agreement "was with the Funeral Home, not with Marsh or Tri-State." Akers, 2011 WL 4908396, at *25. We disagree with this reasoning. Although there was no express agreement between the Akerses and Mr. Marsh, there existed a constructive or involuntary bailment on which a bailment claim could be made.

The bailment claim fails, however, because a corpse is not "personalty" for bailment purposes. See generally Tinsley v. Dudley, 915 S.W.2d 806, 807 (Tenn. Ct. App. 1995) (observing that while there is "no property right in the body of a deceased" at common law, courts "have recognized that a quasi-property right in dead bodies vests in the nearest relatives, and arises from their duty to bury their dead")[14]; 22A Am. Jur. 2d

---

[14] In Crawford v. J. Avery Bryan Funeral Home, Inc., 253 S.W.3d 149, 158 (Tenn. Ct. App. 2007) the Court of Appeals cited the Restatement (Second) of Torts § 869 cmt. a (1965), which states:

> One who is entitled to the disposition of the body of a deceased person has a cause of action in tort against one who intentionally, recklessly or negligently mistreats or improperly deals with the body, or prevents its proper burial or cremation. The technical basis of the cause of action is the interference with the exclusive right of control of the body, which frequently has been called by the courts a "property" or a "quasi-property" right. This does not, however, fit very well into the category of property, since the body ordinarily cannot be sold or transferred, has no utility and can be used only for the one purpose of interment or cremation. In practice the technical right has served as a mere peg upon which to hang damages for the mental distress inflicted upon the survivor; and in reality the cause of action has been exclusively one for the mental distress.

(continued...)

Dead Bodies § 3 (2012) (noting that "[a]t common law, there is no property right in the body of a deceased person"); see also Culpepper v. Pearl St. Bldg., Inc., 877 P.2d 877, 882 (Colo. 1994) (rejecting "the fictional theory that a property right exists in a dead body that would support an action for conversion" because the plaintiffs' claims are "more properly addressed through a tort action related to the infliction of emotional distress"); Louisville & Nashville R.R. v. Wilson, 51 S.E. 24, 25 (Ga. 1905) ("It is not surprising that the law relating to this mystery of what death leaves behind cannot be precisely brought within the letter of all the rules regarding corn, lumber and pig iron."); Bauer v. N. Fulton Med. Ctr., Inc., 527 S.E.2d 240, 244 (Ga. Ct. App. 1999) (affirming dismissal of bailment claim arising from alleged removal of eye tissue from corpse without permission); Edwards v. State, 286 S.W.2d 157, 159 (Tex. Crim. App. 1955) (holding that the taking of custody of a body by a funeral home for the purpose of preparing it for burial does not create a bailment). We affirm the judgment of the trial court granting the motion for JNOV and dismissing the bailment claim.

## VI. Conclusion

The judgments of the Court of Appeals and the trial court are affirmed. Costs on appeal are assessed one-half to the Appellants, Rondal Akers, Jr. and Lucinda Akers, and one-half to the Appellee, T. Ray Brent Marsh, and his surety, for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE

---

[14](...continued)
(Emphasis added). Thus, although courts have characterized the right to possession of a corpse as a "property" or "quasi-property" right, the American Law Institute has recognized that this characterization is primarily a practical means to the end of allowing plaintiffs to recover for emotional distress resulting from mistreatment of a loved one's corpse.

# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### May 8, 2012 Session

## RONDAL AKERS ET AL. v. PRIME SUCCESSION OF TENNESSEE, INC. ET AL.

**Circuit Court for Bradley County**
**No. V-02-623**

---

**No. E2009-02203-SC-R11-CV - Filed October 26, 2012**

---

### ORDER

Petitioner Brent Marsh filed a petition to rehear in this case on October 10, 2012, and a motion to permit extension of time for filing a petition to rehear on October 11, 2012. The petition to rehear was not timely filed. The Court's opinion was filed and judgment entered on September 21, 2012. The mandate issued on October 2, 2012. The time for filing ran on October 1, 2012, pursuant to Tennessee Rule of Appellate Procedure 39(b): "A petition for rehearing must be filed with the clerk of the appellate court within 10 days after entry of judgment unless on motion the time is shortened or enlarged by the court or a judge thereof." Rule 39(b) further states that "[m]otions for extending time to file petitions for rehearing will be allowed only in extreme and unavoidable circumstances." The motion to permit extension of time does not allege appropriate grounds to extend the ten-day time provided in Rule 39.

The petition to rehear and motion to permit extension of time for filing a petition to rehear are therefore dismissed.

We have nevertheless reviewed the issues raised in the petition to rehear, and we agree that the testimony of Dr. William Bass was incorrectly referenced in our original opinion. A corrected opinion is being filed contemporaneously with this order, and we are grateful to Mr. Marsh for bringing this error to our attention. Contrary to Mr. Marsh's argument, however, the modification does not change the factual or legal analysis nor does it require reconsideration of any issue in the case, because Dr. Bass's deposition testimony was largely duplicative of Dr. Berryman's testimony.

-1-

Mr. Marsh again argues that there was insufficient independent evidence to support a negative inference from his Fifth Amendment privilege assertions regarding the claim of intentional infliction of emotional distress presented at trial. For the reasons expressed in the original opinion, we disagree. There was sufficient evidence including Mr. Marsh's conviction for criminal simulation, his reference to a dead body as "Akers" in the GBI video, and the expert testimony of Dr. Berryman. Mr. Marsh's petition argues that "the direct evidence showing cremation outweighed any inference that should be given from Mr. Marsh making statements in a video taken on the night of the discoveries of the bodies at Tri-State Crematory." This argument invites us to independently re-weigh the evidence, which we are not permitted to do.

Mr. Marsh disagrees with our conclusion that his second argument regarding his Fifth Amendment claims was waived and "asserts that reading questions where the Fifth [Amendment privilege] was taken but no inference is given suggests to the jury that the person answering the question somehow deserves a negative inference despite any instruction to the contrary." The problem with this argument is that the trial court clearly correctly explained to the jury the circumstances under which it could draw a negative inference, stating:

> However, you are not required to give the negative inference to a particular answer, and let me tell you I have not given this instruction as to every response he made where he asserted the Fifth Amendment privilege. Not every such response where the Fifth Amendment is asserted may be given a negative inference, only where I instruct you it may be given a negative inference.

Prior to giving the jury this instruction, the trial court informed counsel as to how it was going to instruct the jury on this issue, and no objection was made. The petition raises no issue meriting reconsideration.

PER CURIAM