IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 8, 2018 Session

## SHERRY SMITH EX REL LAUREN TAYLOR AGEE
## v. HANNAH NICOLE PALMER

**Appeal from the Circuit Court for DeKalb County**
**No. 2016-CV-59     Jonathan L. Young, Judge**

_____

**No. M2017-01822-COA-R3-CV**

_____

The mother of a woman whose body was discovered in Center Hill Lake, where she had been camping with several friends, brought this wrongful death action against those friends, alleging that they caused her daughter's death and conspired to cover it up. One of the defendants asserted her Fifth Amendment privilege against self-incrimination in her answer to the complaint and in response to discovery requests; in due course, the defendant moved for summary judgment. The mother filed several affidavits and declarations in response, as to which the defendant filed motions in limine and motions to strike in total or in part. The defendant also asserted her Fifth Amendment privilege as to additional statements of disputed facts filed by the mother in response to the summary judgment motion. The trial court granted or denied, in whole or in part, each motion in limine and to strike; held that the mother was not entitled to an adverse inference as to the defendant's invocation of the privilege in response to discovery and mother's statement of disputed facts in opposition to the summary judgment motion; and granted summary judgment to the defendant. Mother appeals. Upon a thorough review of the record, we reverse the grant of summary judgment, vacate the rulings on the motions in limine that are at issue in this appeal, vacate the holdings relative to defendant's invocation of her Fifth Amendment privilege, and remand the case for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court DeKalb County Reversed in Part and Vacated in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, J., joined. W. NEAL MCBRAYER, J., filed a concurring opinion.

J. Alex Little and Maria Q. Campbell, Nashville Tennessee, for the appellant, Sherry Smith.

Todd G. Cole and Jake VanAusdall, Brentwood, Tennessee, for the appellee, Hannah Nicole Palmer.

1

**OPINION**

## I.  FACTS AND PROCEDURAL HISTORY

Lauren Taylor Agee, along with her friend Hannah Palmer, Ms. Palmer's boyfriend, Aaron Lilly, and Mr. Lilly's friend, Christopher Stout, attended a three-day event in July 2015, "Wakefest," which was held on Center Hill Lake;[1] during the festival, the group camped on a bluff overlooking the lake.  Lauren was not at the campsite when her friends awoke on the morning of July 26; at approximately 4:00 p.m. on that day, two fishermen found Lauren's body floating in a cove close to the bluff where she had been camping.  The DeKalb County Sheriff's Department investigated the [incident] and prepared an investigative report; no criminal charges were brought relating to Ms. Agee's death.

Lauren Agee's mother, Sherry Smith, brought a wrongful death action against Aaron Lilly, Brixner Gambrell,[2] Hannah Palmer, Christopher Stout, and "John Does 1-10 and Jane Does 1-10" on July 22, 2016.  The complaint set forth facts surrounding the circumstances and medical causes of Lauren's death, alleged that Defendants intentionally, recklessly, or negligently caused Lauren's death, and asserted causes of action for wrongful death and intentional infliction of emotional distress.  Hannah Palmer answered the complaint, refusing to answer many of the factual allegations of the complaint by invoking her right against self-incrimination under the Fifth Amendment of the United States Constitution, and asserting numerous affirmative defenses.[3]

In due course, Ms. Palmer moved for summary judgment, asserting nine grounds; eight of the grounds challenged the sufficiency of the factual allegations of the complaint to support the causes of action alleged by the plaintiff, and the other asserted comparative fault on the part of Ms. Agee.[4]  The motion was accompanied by a Tennessee Rule of

---

[1]  Center Hill Lake is a reservoir created by the U.S. Army Corps of Engineers in 1948 as a result of the construction of the Center Hill Dam." *Center Hill Lake Information*, http://centerhill.uslakes.info (last visited Jan. 1, 2019); *U.S. Army Corp of Engineers Center Hill Lake Project History*, https://www.lrn.usace.army.mil/Locations/Lakes/Center-Hill-Lake/History/ (last visited Jan. 1, 2019).  It is located in the Cumberland River Basin, on the Caney Fork River, and covers parts of DeKalb, Putman, White, and Warren Counties. *See U.S. Army Corp of Engineers Center Hill Lake Project History*.  The lake is "64 miles long at the normal summer pool of 648 feet above mean sea level" and has a "[s]horeline distance is 415 miles at the 685 elevation." *Hurricane Marina – Center Hill Lake Info*, http://hurricanemarina.net/lake-info/ (last visited Jan. 1, 2019).

[2]  The record does not show who this person is or the person's relationship to Ms. Agee or the other defendants.

[3]  The other defendants answered separately and are not parties to this appeal.
[4]  The grounds stated in the motion were:

  1. The Complaint fails to aver facts sufficient to establish personal jurisdiction over

Civil Procedure 56.03 Statement of Undisputed Material Facts ("the Statement")[5] and four exhibits, the nature and content of which will be discussed later in this opinion.

Ms. Smith responded to the motion, disputing several of the material facts; as part of her response, she attached her own affidavit, the affidavit of Sheila Wysocki, a private investigator, and Ms. Palmer's answer to the complaint, responses to discovery, and deposition upon written questions. In her response to Ms. Palmer's Rule 56.03 statement, Ms. Smith included additional material facts that she contended were disputed and precluded summary judgment; she later supplemented her response, asserting additional disputed facts, and filed the declarations of Dr. Amy Gruszecki, a forensic pathologist, Dan Hodges, Lou Leiker, an officer for 34 years with the Los Angeles Police Department, and Chris Yarchuk, a former Sargeant with the White County Sheriff's Department and the affidavit of Ryan Melanson, a Sargeant with the White County Sheriff's Department.

Ms. Palmer responded to Ms. Smith's statement of additional disputed material facts, asserting that the evidence cited by Ms. Smith in her statement "was inadmissible" and asserting her Fifth Amendment privilege against self-incrimination as to each of the statements.[6] Along with her response, Ms. Palmer filed motions to strike the affidavit of

Defendant.
2. The Complaint fails to aver facts sufficient to establish that venue is proper in DeKalb County, Tennessee.
3. The Complaint fails to aver facts sufficient to satisfy the elements of intentional tort as to Defendant.
4. The Complaint fails to aver any specific acts by Defendant that directly or proximately caused the injuries from which Plaintiff seeks relief.
5. The Complaint fails to aver facts sufficient to satisfy the elements of reckless conduct as to Defendant.
6. The Complaint fails to aver facts sufficient to satisfy the elements of negligent conduct as to Defendant.
7. The Plaintiff is barred from recovery due to the comparative fault of Lauren Agee.
8. The Complaint fails to aver facts sufficient to satisfy the elements of intentional infliction of emotional distress as to Defendant.
9. The Complaint fails to aver facts sufficient to support Plaintiff's request for punitive damages.

[5] Tennessee Rule of Civil Procedure 56.03 states:

In order to assist the Court in ascertaining whether there are any material facts in dispute, any motion for summary judgment made pursuant to Rule 56 of the Tennessee Rules of Civil Procedure shall be accompanied by a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each fact shall be set forth in a separate, numbered paragraph. Each fact shall be supported by a specific citation to the record.

[6] Ms. Palmer's response was styled "Defendant Palmers' Reply Consolidated Statement Of Undisputed Material Facts And Responses To Additional Material Facts In Support Of Defendant Palmer's Motion

3

Sherry Smith and the declaration of Dan Hodges, and motions in limine to exclude portions of the declarations or affidavits of Dr. Gruszecki, Lou Leiker, Sheila Wysocki, Chris Yarchuk, and Ryan Melanson. In reply, Ms. Smith filed the declaration of Chris Brown.

The court heard the motions in limine, motions to strike, and motion for summary judgment and subsequently entered an order: granting the motion to strike the declaration of Mr. Hodges; partially striking the affidavit of Ms. Smith; denying the motion in limine as to Dr. Gruszecki; and granting in part the motions in limine as to the declarations or affidavits of Mr. Leiker, Ms. Wysocki, Mr. Yarchuk, and Mr. Melanson; and holding that the statements in the declaration of Mr. Brown "are hereby retained." In the order, the court also granted the motion for summary judgment. Ms. Smith appeals the grant of summary judgment as well as the rulings on the motions in limine and motions to strike.

Upon our *de novo* review, we have determined that summary judgment was improvidently granted and should be reversed and the case remanded. Because the appeal also raises issues relative to the court's rulings on the motions in limine and to strike, as well as Ms. Palmer's invocation of her Fifth Amendment privilege against self-incrimination, the resolution of which will guide the court and the parties on remand, we will address those matters.

## II.    ANALYSIS

### A.    Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. A trial court's decision on a

---

For Summary Judgment." She prefaced the response with the following statement:

> COMES NOW, Defendant Hannah Nicole Palmer, (hereinafter "Defendant"), by and through undersigned counsel and pursuant to Tenn. R. Civ. P. 56, and hereby replies to Plaintiff's Supplemental Responses to Defendant Palmer's Statement of Material Facts and Responds to Plaintiff's Additional Material Facts. Through this pleading, Defendant Palmer provides the Court with the identification of those Statements of Undisputed Material Facts that Plaintiff claims to dispute along with a reply to Plaintiff's purported dispute, showing that the identified Statement of Fact ("SOF") is not in dispute – because Plaintiff either cited to evidence that is inadmissible and should be excluded and/or stricken from the record to support the dispute (violation of Tenn. R. Civ. P. 56.03) or the response and/or cited testimony does not refute the SOF as Plaintiff claims. As further described below, the primary substance of each SOF is not disputed. Plaintiff's actual admission and implied admission of Defendant Palmer's SOF entitles Palmer to summary judgment dismissing Plaintiff's claims against Defendant Palmer with prejudice.

4

motion for summary judgment presents a question of law, which we review de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. Of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015), *cert. den.*, 136 S.Ct. 2452 (2016). Thus, we must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied."

The moving party has the burden of persuading the court that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. *Byrd v. Hall*, 847 S.W. 2d 208, 215 (Tenn. 1993). If the moving party fails to satisfy that burden, the motion should be denied. *Id*. If the moving party fails to make the required showing, then "the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails." *McCarley v. West Quality Food Serv.,* 960 S.W.2d 585, 588 (Tenn. 1998); *accord Staples v. CBL& Assoc., Inc.,* 15 S.W.3d 83, 88 (Tenn. 2000).[7] As noted earlier, Rule 56.03 requires the movant to set forth facts as to which it contends there is no genuine issue for trial, supported by a specific citation to the record. "The purpose of the requirements of Tenn. R. Civ. P. 56.03 is to 'assist the Court in focusing on the crucial portions of the record' in determining whether there is a genuine issue requiring a trial on the merits." *Cox v. Tennessee Farmers Mut. Ins. Co.*, 297 S.W.3d 237, 244 (Tenn. Ct. App. 2009) (citing Advisory Committee Comment to Tenn. R. Civ. P. 56.03). Accordingly, documents filed in support of a motion for summary judgment must be authenticated and admissible at trial. Tenn. R. Civ. P. 56.06; *Cox*, 297 S.W.3d at 246.

Along with the Statement, Ms. Palmer filed four exhibits: an unsworn and unverified handwritten document entitled "voluntary statement," ostensibly given by Kassie Marie Franks on August 17, 2015[8]; an unverified laboratory report prepared by Aegis Crime Labs; an unverified and unsigned document entitled "Autopsy Report"; and an unverified document entitled "DeKalb County Sheriff's Department Investigative Report." The Statement itself consists of sixteen statements of material fact, seven of which are supported by citation to the allegations at paragraphs 14, 15, 16 and 20 of the

---

[7] Our Supreme Court has instructed:

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.

*Rye*, 477 S.W.3d at 250, 264-65.

[8] It appears from the statement that Ms. Franks attended Wakefest and interacted with Ms. Agee and Ms. Palmer.

complaint[9]; one statement is derived from the unverified statement of Kassie Franks; two statements are from the unverified laboratory report; and three statements each from the unverified autopsy report and Sheriff's report.[10]

To the extent that Ms. Franks' statement and the Investigative Report are tendered as testimony of Ms. Franks and Officer Taylor, they wholly fail to comply with the requirements of Rule 56.06 that "supporting . . . affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." In like manner, the laboratory and autopsy reports do not meet the requirement of Rule 56.06 that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." In addition, the unverified documents constitute inadmissible hearsay, *see* Tennessee Rule of Evidence 802, and the presentation of the documents wholly fails to meet the requirement of Tennessee Rule of Evidence 901 that the documents be authenticated "as a condition precedent to admissibility." Ms. Palmer cannot rely on these documents to satisfy her burden.

---

[9] The allegations of the complaint were:

> 14. In the early morning hours of July 26, 2015, Lauren Agee was killed through the intentional, negligent, or reckless acts of Defendants.
> 15. Prior to her death, Lauren Agee had attended a three-day event, known as "Wakefest," at Center Hill Lake with Defendants Palmer, Lilly, and Stout, during which she stayed at a campsite selected by Defendants Gambrell and Lilly. The campsite consisted of a tent and two Enos ("hammocks").
> 16. In initial statements to the authorities, Defendant Palmer claimed that Lauren Agee returned to the campsite with all Defendants in the early morning hours of July 26, 2015 after visiting a bar on the lake. Palmer claimed that Lauren Agee wanted to go home, but that Palmer took Lauren Agee's keys. Upon returning to the campsite, Palmer claimed that she and her boyfriend, Defendant Lilly, went to sleep in the tent while Lauren Agee slept in the hammock with Defendant Stout.
>
> * * *
>
> 20. At approximately 4:00 P.M. on July 26, 2015, two fishermen found Lauren Agee's lifeless body floating in the water in a cove.

In her answer to the complaint, Ms. Palmer states "Defendant refuses to answer the averments in Paragraph [14, 15 and 16] and asserts her rights under the Fifth Amendment to the United States Constitution" as to those paragraphs, and responds that she is "without knowledge or belief as to the truth of the averments in Paragraph 20."

[10] This document is entitled "DeKalb County Sheriff's Department Investigative Report" and is represented to detail Detective Jeremy Taylor's investigation of Ms. Agee's death; it is not verified or otherwise authenticated as either his report or as an official record of the Sheriff's Department. Ms. Palmer refers to this as "Detective Taylor's Investigative Report."

The seven statements in the Statement of Undisputed Material Facts referencing the allegations of the complaint state:

1. This cause of action arises from the death of Lauren Taylor Agee. Complaint ¶ 14.
RESPONSE:

2. Agee's death occurred on or about July 26, 2015. Complaint ¶ 14.
RESPONSE:

3. Agee's body was found in Center Hill Lake on or about 4:00 PM on July 26, 2015. Complaint ¶ 20.
RESPONSE:

4. At the time of Agee's death, Plaintiff avers Defendant was attending a three day music festival called "Wakefest" at Center Hill Lake. Complaint ¶15.
RESPONSE:

5. Plaintiff avers that Agee and the other Defendants were also attending Wakefest. Complaint ¶ 15.
RESPONSE:

6. Agee did not object to the location of the campground the group chose to stay at during Wakefest. Complaint ¶ 15.
RESPONSE:

* * *

8. Plaintiff avers Agee visited a local bar the evening of July 25, 2015 and stayed until the early hours of July 26, 2015. Complaint ¶ 16.
RESPONSE:

These statements do not constitute "facts as to which [Ms. Palmer] contends that there is no genuine issue for trial." See Tenn. R. Civ. P. 56.03. Rather, they are merely unverified reworded statements of some of the factual allegations of the complaint, and are not proof of the fact asserted; a bare citation to the complaint does not establish the fact alleged therein for summary judgment purposes.

Upon our de novo review, we have determined that Ms. Palmer did not satisfy her initial burden to produce evidence showing there *was not* a genuine issue of fact for trial; without doing so, the burden never shifted to Ms. Smith to produce evidence showing

7

that there *was* a genuine issue for trial. *Rye*, 477 S.W.3d at 265; *Martin*, 271 S.W.3d at 83. For these reasons, we conclude that summary judgment was improvidently granted.[11]

### B. Motions in Limine and Motions to Strike

Ms. Smith filed three affidavits and five declarations in response to the summary judgment motion; Ms. Palmer moved to strike or to exclude parts or the whole of each affidavit and declaration except the declaration of Chris Brown. As part of the order granting summary judgment, the trial court ruled on each motion, striking Mr. Hodges' declaration, partially striking Ms. Smith's affidavit, denying the motion in limine as to Dr. Amy Gruszecki, and granting in part the motions in limine as to the declarations of Mr. Leiker and Mr. Yarchuk, and the affidavits of Ms. Wysocki and Mr. Melanson.[12] Ms. Smith argues that the trial court erred in its rulings on these motions because it "impermissibly weighed the expert's affidavits and considered some fact testimony to be opinion testimony."

A motion in limine refers to "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Pullum v. Robinette*, 174 S.W.3d 124, 135 n. 11 (Tenn. Ct. App. 2004) (quoting *Luce v. U.S.*, 469 U.S. 38, 40 n. 2 (1984)). This court has previously discussed the role that motions in limine play in litigation:

> A motion in limine provides a vehicle for requesting guidance from the trial court prior to trial regarding an evidentiary question which the court may provide, at its discretion, to aid the parties in formulating their trial strategy. It enables the trial court, prior to trial, to exclude anticipated evidence that would clearly be inadmissible for any purpose at trial. It is, essentially, a substitute for an evidentiary objection at trial.

*Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 192 (Tenn. Ct. App. 2008) (citations and footnotes omitted). We have also discussed the applicable standard of review for motions in limine:

---

[11] Additionally, with the exception of the allegation of comparative fault, the grounds on which Ms. Palmer based her motion for summary judgment were that Ms. Smith failed to aver facts in the complaint sufficient to establish the causes of action. This is an argument more properly made in a motion under Tennessee Rule of Civil Procedure 12.02(6).[11] In that context, the allegations of the complaint are taken as true and the movant must show that "the alleged facts will not entitle the plaintiff to relief" or "the complaint is totally lacking in clarity and specificity." *Cty. of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 54 (Tenn. Ct. App. 2004) (citing *Dobbs v. Guenther,* 846 S.W.2d 270, 273 (Tenn. Ct. App. 1992)). Taken as true, the allegations of the complaint clearly state a claim for relief.

[12] The court denied the motion in limine as to Dr. Gruszecki's declaration; while no motion to strike or exclude the declaration of Mr. Brown had been filed, the court held that he "is an eyewitness" and that the statements in his declaration "are hereby retained." Ms. Palmer does not appeal either ruling.

> With a few exceptions, . . . the trial court is given broad discretion in the timing of its decisions on the admissibility of evidence. . . . An appellate court will not reverse a trial court's decision on the admissibility of evidence, including a ruling on a motion *in limine,* absent clear abuse. Similarly, an appellate court will not reverse a trial court's exercise of discretion in ruling on an evidentiary motion *in limine* unless the trial court abused the wide discretion given it to handle such motions.

*Pullum*, 174 S.W.3d at 136-37 (citations omitted).[13]

The trial court excluded portions of the declarations of Mr. Leiker, Ms. Wysocki, Mr. Yarchuk, and Mr. Melanson on the basis of Tennessee Rules of Evidence 701, 702 and/or 703, which govern the admissibility of opinions by lay persons and experts. The court struck the declaration of Mr. Hodges as inadmissible hearsay. Although not expressly stated, it is apparent that the court struck a portion of Ms. Smith's affidavit under the cited rules of evidence, inasmuch as the court stated that it took the action because "the Plaintiff does not have expert knowledge." Upon our review of the record, we have concluded that, in ruling on the motions, the trial court erroneously excluded admissible opinions; in addition, the court erroneously classified some permissible lay opinions as impermissible expert opinions.

We begin our analysis by noting that Ms. Palmer did not file any competing affidavits or declarations to those filed by Ms. Smith or challenge the ability of the witnesses proffered by Ms. Smith to give the opinions they did. In ruling on summary judgment, the trial court had only the affidavits and declarations which had been filed by Ms. Smith, as abridged by the rulings on the motions in limine and to strike, as well as the Rule 56.03 statements. While a trial court has the responsibility to determine the competency of any proffered expert, as well as the admissibility of the expert's

---

[13] While not dispositive of this issue, we are also mindful that, in ruling on the motion for summary judgment, the trial court considered affidavits and declarations that were the subject of the motions in limine. As noted in *Duran*:

> Motions in limine serve fundamentally different purposes than motions for summary judgment. They are not subject to the same procedural safeguards. Thus, a motion in limine should not be used as a substitute for a dispositive motion such as a motion for summary judgment. Courts that have addressed attempts to use a motion in limine in such a manner, either explicitly or implicitly, have found such use to be in error. As several courts have noted, a motion in limine should not be used to "choke off" a party's entire claim or defense.

271 S.W.3d at 192-93 (citations omitted). As more fully explained herein, the wisdom of this instruction is borne out in our consideration of this case.

testimony, it is not clear from the record which standards the trial court in this case used in making its rulings. We discuss each ruling in turn.

### 1. Declaration of Lou Leiker

Mr. Leiker is a former police officer who now does "investigative and consulting work, including homicide investigations." In his declaration, Mr. Leiker states the following as to the basis of his expertise and opinions:

> 2. During my law enforcement career, I worked for 34 years in the Los Angeles Police Department, from 1974 — 2009, including 18 years of homicide experience involving 400 murder investigations, and toward the end of my career, supervision of the biggest gang unit in the United States. I participated along with the Federal Bureau of Investigation in a multi-year Organized Crime and Drug Enforcement Task Force investigation which led to the federal prosecution of more than 40 defendants for drug trafficking, money laundering, firearms, and violent offenses. I retired from the Los Angeles Police Department in 2009, and since that time, I have undertaken investigative and consulting work, including homicide investigations. I have attached a copy of my resume as Exhibit 1.
>
> 3. I have reviewed the investigation of the death of Lauren Agee. In the course of my review, I analyzed the police file, witness statements given to police and others, and photographs of the scene and Lauren Agee's body. I consulted with individuals who conducted interviews with those who were with Lauren Agee on the weekend of her death, and I have reviewed the declaration of Amy C. Gruszecki, MSFS, DO, FCAP who reviewed Lauren Agee's autopsy.

Mr. Leiker expressed four opinions in his declaration: that Lauren Agee's death was a homicide and not an accident; that her death was covered up by the Defendants; that the police investigation was insufficient; and that there was evidence of a continued conspiracy on the part of the Defendants. As to each opinion, Mr. Leiker set forth the factual basis of the opinion, and attached relevant documents. Ms. Palmer did not file any countervailing affidavit or declaration to rebut the opinions expressed by Mr. Leiker but moved to exclude every paragraph of Mr. Leiker's declaration, except paragraph 2, quoted above; a written argument was incorporated into the motion and a memorandum filed in support, but no exhibits were filed in support of the motion. The trial court struck the following statements from Mr. Leiker's declaration (stricken statements in italics):[14]

---

[14] The words in regular type were not excluded by the trial court, but are included to give context to those excluded.

9. There is evidence of homicide in this case, including:

a. There was no water found in Lauren's lungs. (Exh. 9, at 5.)

b. There are injuries to Lauren's body that indicate that she was involved in a struggle prior to her death, and are not consistent with a fall:

i. There are symmetrical injuries to Lauren's back. (Exh. 10.) *These symmetrical marks consistent with a body being dragged.*

ii. *Lauren's clothes and injuries are inconsistent with a fall.* (Exh. 11.) Lauren's injuries do not include scrapes on the uncovered portions of her body as would be expected if a person had fallen through the brush that was present on the hillside.

iii. Lauren's neck shows signs of hemorrhaging, *consistent with being held down by the throat.* The medical examiner's report did not note the hemorrhaging.

iv. *The bruising on Lauren's body is not consistent with a fall. (See all photo exhibits.)*

10. *Based upon my experience in law enforcement and my review of the facts in this matter, it is my conclusion that there is evidence that Lauren Agee's death was a homicide caused by the defendants in this case.*

12. In addition to the symmetrical scraping on Lauren's back discussed above (Exh. 10), while Lauren was found in the water, there was no indication that she drowned. *Thus, Lauren was dead before she entered the water.*

13. *Also highly suspicious was the arrival of two of the defendants at the location of the body within moments after it was found. In addition, Stout and Lilly called out that their friend was missing. Their statements and quick arrival indicate prior knowledge on their part as to the placement of Lauren's body. In my experience, the likelihood that the defendants would arrive by chance at the location of the body at the exact same moment it was found by a third party is almost zero.*

20. *The medical exam omitted key information that is clearly visible in the autopsy photographs, including the fact that Lauren's neck shows signs of*

11

*hemorrhaging, consistent with being held down by the throat.*

*21. The medical exam listed "possible drowning" as a contributing cause of death despite the fact that no fluid was found in Lauren's lungs.*

*22. The alcohol rate listed in the medical report does not mention the medically recognized potential for fermentation of alcohol post-death which can result in raised levels being found.*

In excluding the portions of Mr. Leiker's declarations, the court stated the following:

a. Mr. Leiker is an expert regarding law enforcement considerations and is qualified to render an opinion on the sufficiency of the police investigation.

b. Mr. Leiker is not an expert regarding autopsies or the medical circumstances surrounding Ms. Agee's death and therefore is neither capable of concluding that there was a homicide based on these facts, nor qualified to render an opinion on the sufficiency of Dr. Deering's medical examination.

c. Mr. Leiker, as a law enforcement officer but not an otherwise qualified expert, is not capable of rendering an expert medical opinion as to the time of Ms. Agee's death.

d. Mr. Leiker's statement of an "almost zero"[15] probability is a non-scientific opinion which violates the Tennessee Rules of Evidence 702 and 703 and the first four prongs of the *McDaniel* test.

As noted earlier, we review the court's ruling under the abuse of discretion standard, succinctly set forth in *Lee Medical, Inc. v. Beecher*:

An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

---

[15] Mr. Leiker had specifically opined that "[i]n his experience, the likelihood that the defendants would arrive by chance at the location of the body at the exact same moment it was found by a third party is almost zero."

312 S.W.3d 515, 524 (Tenn. 2010) (internal citations omitted).

Tennessee Rules of Evidence 701,[16] 702,[17] and 703[18] govern the admissibility of opinions by lay persons and experts. In determining Mr. Leiker's areas of expertise, the trial court did not explain the "law enforcement considerations" as to which the court deemed him qualified to express an opinion or the considerations that rendered him unqualified to express an opinion as to the other matters. The court did not define an area of expertise or otherwise set out the parameters of Mr. Leiker's ability to express an opinion relative to the evidence he reviewed. Ms. Palmer failed to file any countervailing affidavits or evidence informing the court's determinations at paragraphs b and c, above. Moreover, to the extent the court determined that Mr. Leiker was not qualified to express an opinion as to all the matters which were stricken, it is apparent that the court did not consider the opinions admissible under Rule 701.

Mr. Leiker's declaration established that he investigated homicides for 18 years as part of his 34 year history with the Los Angeles Police Department, and that he has worked as a private investigator, also investigating homicides since that time. The trial court determined that Mr. Leiker was not qualified to express the opinions which were stricken by the court, each of which is based on facts in the record or inferences drawn from those facts. In the stricken portions of paragraphs 9, 12, and 13, Mr. Leiker

---

[16] Tennessee Rule of Evidence 701 states in pertinent part:

(a) Generally. If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
(1) rationally based on the perception of the witness and
(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

[17] Tennessee Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

[18] Tennessee Rule of Evidence 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

expressed his opinion as to certain physical and circumstantial evidence; there is nothing in the record to indicate that he is not qualified to express those opinions, which are consistent with his experience and training as a homicide investigator.

For the same reason, Ms. Leiker is fully qualified to express the opinion in paragraph 10, which is squarely within the scope of his expertise and experience, and is based on the evidence in the record.

With respect to paragraphs 20 through 22, in addition to the foregoing reasons, the trial court erred in excluding these paragraphs because they do not contain opinions that are contrary to Rule 702 and the statements are supported by evidence in the record. In these paragraphs, Mr. Leiker compares contradictory pieces of evidence and describes information that he would expect to see as part of the investigation, given his experience and expertise.

For the foregoing reasons, we conclude that the court abused its discretion in striking paragraphs 9, 10, 12, 13, and 20-22 of Mr. Leiker's declaration and vacate the ruling.

### 2. Affidavit of Sheila Wysocki

Ms. Wysocki is a licensed private investigator who was hired by Sherry Smith to investigate Ms. Agee's death. In her declaration, she explained the basis for her expertise:

> I have been a licensed private investigator since 2004. During my career as a private investigator I have logged more than 10,000 hours of investigatory work. In addition to other general investigatory work, I specialize in cold case homicides, violent crime, and missing persons cases. I have attached a summary of my scope of experience and the responsibilities associated with each area of specialization.

She also explained how she became involved in the case and what steps she took in her investigation:

> I was hired by Sherry Smith to investigate the death of her daughter, Lauren Agee. In the course of my year-long investigation, I analyzed the police file, witness statements given to police and others, and photographs of the scene and Lauren Agee's body. I conducted interviews with those who were with Lauren Agee on the weekend of her death, and I consulted with Amy C. Gruszecki,[19] MSFS, DO, FCAP to review Lauren Agee's autopsy.

---

[19]  Dr. Gruszecki is the Medical Director and Chief Forensic Pathologist for American Forensics in Dallas, Texas; she also works as a contract Medical Examiner for the Mississippi State Medical

14

I also participated in investigatory experiments at the scene of Lauren Agee's death. These experiments concluded as described below, that Lauren Agee could not have fallen into the water from the campsite, and even if she had, her body would not have been carried by natural forces to the location where it was ultimately found.

Ms. Wysocki opined that Ms. Agee's death was not an accident, that defendants had engaged in a conspiracy and a cover up to hide Ms. Agee's true cause of death, and that the police had performed an insufficient investigation into Ms. Agee's cause of death. She also performed several experiments meant to recreate the circumstances surrounding Ms. Agee's death and recounted those experiments and their results in her affidavit.

In her motion to exclude portions of Ms. Wysocki's affidavit, Ms. Palmer argued that Ms. Wysocki lacked the expertise necessary to form medical opinions and the experiments she performed were inadmissible because they did not meet the requirements set forth in *McDaniel v. CSX Trans., Inc.*, 955 S.W.2d 257 (Tenn. 1997).

Without indicating the specific statements to which it referred, the trial court ruled that "[t]he non-factual statements of paragraph 9, experiments of 9(c), 10, 11, second sentence of 12, 17-21, 22-24, experiments of 25-41, and experiments of 44 of the Affidavit of Sheila Wysocki are hereby stricken from the record." In excluding these portions of the affidavit, the court stated;

a. Ms. Sheila Wysocki is an expert in private investigation and therefore is qualified to search for and investigate facts.

---

Examiner's Office. In her declaration she stated, *inter alia*, that she "reviewed Lauren Agee's autopsy report and the photographs taken during the autopsy" and made the following findings:

> a. Lauren Agee's throat shows some areas of hemorrhage as demonstrated in the autopsy photographs. While Lauren's throat was documented through photographs during the autopsy, the hemorrhages were not noted in the autopsy report.
> b. The hemorrhaging in Lauren Agee's throat are consistent with a significant fall or pressure to the neck as in strangulation.
> c. Lauren Agee's back shows a tremendous amount of hemorrhage, indicating that she received significant blunt force trauma to her back while she was still alive.
> d. The hemorrhage in Lauren Agee's back represents blunt force trauma to the back, consistent with a significant fall or inflicted trauma.

4. Further investigation and outside of the medical exam is needed to determine the manner of death as other than accident.

The trial court did not exclude any portions of Dr. Gruszecki's declaration.

b. Ms. Wysocki is not a qualified medical expert, accident reconstruction expert nor an expert on formal law enforcement procedures pursuant to the *Shipley* analysis, and therefore cannot testify as an expert as to anything outside her private investigation expertise.

c. Ms. Wysocki's entire affidavit shall be analyzed as an expert opinion, except for her observation of Aaron Lilly in ¶36 of her affidavit.

d. Ms. Wysocki can testify as a lay witness as to what she heard described in ¶36 of her affidavit.

e. Ms. Wysocki's Affidavit ¶9 non-factual statements, including conclusions that there were bite marks on Ms. Agee's body are inconsistent with expert medical opinions.

f. Ms. Wysocki and Mr. Melanson[20] are not qualified medical experts.

g. Ms. Wysocki and Mr. Melanson's experiments lacked any scientific, technical, or otherwise specialized knowledge and therefore their experiments violated the fifth prong of the *McDaniel* test.

h. Ms. Wysocki provided no competent proof regarding Ms. Agee's death, specifically, no proof that Defendant Palmer caused Ms. Agee's death and therefore her statements violate Tennessee Rules of Evidence 701, 702, and 703.

i. Ms. Wysocki's Affidavit ¶25-41 experiments are improper conclusions about truthfulness as Ms. Wysocki is neither a behavioral expert, nor a medical expert.

In determining Ms. Wysocki's area of expertise, the trial court ruled that Ms. Wyocki is qualified to "search for and investigate facts"; however, Ms. Wysocki also formulated and rendered opinions as to the issues in the case based on those facts investigated. *See* Tenn. R. Evid. 702. In this regard, the court did not specify the considerations that led the court to render Ms. Wysocki unqualified to express the opinions that the court ruled were not within what the court characterized as "her private investigation expertise." Moreover, as with Mr. Leiker, to the extent Ms. Wysocki was

---

[20] Mr. Melanson was a sergeant with the White County Sherriff's Department at the time of Ms. Agee's death and, according to his declaration, was "present during the law enforcement response to the death of Lauren Agee and observed the investigation."

not qualified to express an opinion as to those matters which the court struck, it is apparent that the court did not consider the opinions admissible under Rule 701.

Mr. Wysocki's affidavit established that she has been a licensed private investigator for over a decade, and as such, she has "logged more than 10,000 hours of investigatory work."[21] In paragraph 9(a), Ms. Wysocki states her opinion that Ms. Agee could not have drowned because there was no water found in her lungs; in paragraph 9(b), Ms. Wysocki states various opinions about the source of Ms. Agee's injuries; in paragraph 9(c),[22] Ms. Wysocki recounts three "experiments" she performed at the scene of Ms. Agee's death, their results, and her conclusions. We conclude that the opinions stated in paragraph 9 of Ms. Wysocki's affidavit are permissible opinions within her expertise as stated in her declaration. As with Mr. Leiker's declaration, Ms. Palmer failed to introduce any evidence to refute Ms. Wysocki's expertise, training, or ability to express the opinions which were stricken; as a result, there is no evidence in the record to conclude that she is not qualified to express those opinions, all of which are consistent with her experience and training as a private investigator.

---

[21] In the attachment to her affidavit, Ms. Wysocki states that, among other things, she has worked "cold cases" wherein she reviewed the autopsy and police report, interviewed witnesses, and "recreated crime scene based on the police report" and "on evidence."

[22] Paragraph 9(c) of Ms. Wysocki's affidavit stated:

> c. I participated in three experiments at the scene of Lauren Agee's death to determine whether evidence supported the conclusion that her death resulted from an accidental fall from the campsite. These tests all concluded that the theories and conclusions of the police investigation were incorrect.
>
> > i. In the first test, a body the size and weight of Lauren was pushed, pulled, and thrown from various locations at the campsite. In no scenario did the body fall into the water after striking the cliffside in such a way that was consistent with the injuries suffered by Lauren.
> >
> > ii. In the second test, buoys were placed along the waterfront by the campsite. The currents never carried the buoys to the location where Lauren's body was ultimately found.
> >
> > iii. A third experiment was conducted with milk jugs filled with water to test the flow of water to the second cove. The day the experiment was done the weather conditions were conducive to the jugs reaching the second cove because the wind was blowing in the direction of the second cove. The milk jugs never made it, in fact they floated back to the bank of the cliff where Lauren was camping.

The trial court also struck the following statements from Ms. Wysocki's declaration (stricken statements in italics):[23]

10. *Based upon my experience as an investigator, the facts discovered during my investigation and the evidence of a cover-up discussed below, it is my conclusion that Lauren Agee's death was a homicide caused by the defendants in this case.*

11. *Based on my experience, there is strong evidence that the defendants conspired to cover up Lauren Agee's homicide.*

12. Lauren's body was found by the water's edge. *As discussed above, however, the body could not have been carried by natural forces to the location where it was ultimately found.*

For the same reasons that the statements in paragraph 9 are admissible, these paragraphs contain opinions which are within the scope of her expertise and experience and are based on the evidence in the record.

In paragraphs 17 through 21, Ms. Wysocki expressed her opinion that the police investigation into Ms. Agee's death was inadequate and stated the evidence which she felt supported that opinion. With respect to these paragraphs, in addition to the foregoing reasons, we see no reason that Ms. Wysocki, who the trial court held was qualified to search for and investigate facts, was not qualified to express an opinion on the adequacy of the police investigators investigation; Ms. Wysocki can opine as to the adequacy and conduct of an investigation, whether it is performed by a private investigator or a government investigator.

Paragraphs 22 through 24 of Ms. Wysocki's affidavit are almost verbatim[24] recitations of paragraphs 20 through 22 of Mr. Leiker's declaration, quoted previously.

---

[23] The words in regular type were not stricken by the trial court, but are included to give context to those excluded.

[24] Paragraph 22 of Ms. Wysocki's affidavit states:

22. The medical exam omitted key information that is clearly visible in the autopsy photographs, including:

    a. Lauren's neck shows signs of hemorrhaging, indicating that she was strangled or
    held down by the throat;
    b: The bite-mark on Lauren's chest;
    c. The imprint on Lauren's left knee; and
    d. The U-shaped marks on her body.

For the same reason that Mr. Leiker was qualified and competent to give those opinions, so was Ms. Wysocki.

In paragraphs 25 through 41, Ms. Wysocki recounted the facts and her observations arising from an interview she conducted with Ms. Palmer, during which she also talked with Brix Gamble and Aaron Lilly. The trial court excluded these paragraphs, stating that they were "experiments" and contained "improper conclusions about truthfulness" because "Ms. Wysocki is neither a behavioral expert, nor a medical expert." The exclusion of these paragraphs was error for two reasons. First, the paragraphs contain many factual statements that are based on Ms. Wysocki's investigation of the circumstances of Lauren Agee's death and her interview with Ms. Palmer and the others; there is no basis in law for the exclusion of those facts. Second, the opinions expressed by Ms. Wysocki in the paragraphs do not require expert qualifications; Ms. Wysocki's statements that Ms. Palmer was "insincere" and "rehearsed," that Mr. Gamble was "panicky" and "weak," that Mr. Lilly was "agitated," do not call for expertise within the purview of Rule 702, but are opinions that are "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue" within the meaning of Rule 701.

In paragraph 44, Ms. Wysocki stated:

44. Based on the physical evidence, the circumstantial evidence, and the behavior of defendants, it is my conclusion that Lauren Agee's death was a homicide caused by the defendants in this case.

This opinion flows from Ms. Wysocki's expertise in private investigation, which the court determined qualified her "to search for and investigate facts." The court abused its discretion when it limited her ability to express her opinion as to the results of her investigation. Again, there was no countervailing affidavit as to either her expertise or her opinions, merely Ms. Palmer's argument.

For the foregoing reasons, we conclude that the court abused its discretion in striking those portions of Ms. Wysocki's affidavit and vacate the ruling.

### 3.    Declaration of Chris Yarchuck

Mr. Yarchuck is a reserve deputy with the White County Sheriff's Department and was the head of security for the WakeFest event; he states in his declaration that he "was present during the law enforcement response to [Lauren Agee's] death and observed the investigation." As the basis of his expertise he stated:

I have worked in law enforcement as an officer since 2011, and I graduated from the police academy in 2012. Beginning in 2014 I worked for the White County Sheriff's Department as a patrolman; in 2016 I made

Detective at the rank of [Sargeant]. Currently, I remain a reserve deputy with the White County Sheriff's Department, and I am Director of Security for Tootsie's Worldwide Entertainment.

In her motion to exclude paragraphs 9 through 13 of Mr. Yarchuck's declaration, Ms. Palmer argued:

Mr. Yarchuk is unqualified to make the majority of observations and conclusions he made in his Declaration, where his statements are based upon personal knowledge they exceed the realm of lay opinion testimony, his conclusions exceed the degree in which he is qualified as an expert, and his methods at arriving at his expert opinions are unreliable.

The trial court granted the motion in part, striking all or part of paragraphs 4, 5, 6, 7, 11 and 12; those paragraphs state:[25]

4. On July 26, 2015, I was informed that there was a body in the water in Center Hill Lake. As I took a motorized boat over to the location of the body, I passed two men, Aaron Lilly and Christopher Stout, who were sitting in a canoe docked at a houseboat nearby. As my boat approached the body, Lilly and Stout followed us in their canoe and called out to us that their friend was missing.

5. Based on my firsthand impressions and my experience in law enforcement, the response by Lilly and Stout was odd, indicating to me that they already knew where the body was located in the water and that they were waiting for the body to be found.

6. Upon discovering the body in the lake, I knew immediately that the victim did not drown and that she had died before entering the water. In my experience as a member of law enforcement dive recovery teams, drowning victims sink due to water in the lungs. This body, in contrast, was floating which indicated that the victim did not have water in her lungs and did not drown.

7. The injuries I observed on Lauren Agee's body and the damage to her clothes, however, were not consistent with a fall down a cliff either. She did not have scrapes on her arms and legs from brush that [would] occur in a fall down the particular cliff at issue, and she did not have mud, grass, or other stains on her clothes that would likewise occur.

---

[25] The court stated it was striking "paragraphs 4 (regarding its conclusions), 5, 6 (regarding the mentioned cause of death), 7 (regarding its medical conclusions), 11, and 12," but did not specify the particular words or phrases in paragraphs 4, 6 and 7.

11. I later conducted an experiment at the scene of Lauren Agee's death to determine whether evidence supported the conclusion that her death resulted from an accidental fall from the campsite. In this test, I pushed, pulled, and threw a dummy the size and weight of Lauren Agee was from various locations at the campsite. As I initially believed would be the case from my firsthand knowledge and my experience as a detective, in no scenario did the body fall into the water after striking the cliffside in such a way that was consistent with the injuries suffered by Lauren Agee.

12. Based on this test I concluded that Lauren Agee did not die in the manner so concluded by law enforcement in this case.

In excluding these portions of Mr. Yarchuk's declaration, the court stated:

a. Mr. Chris Yarchuk is an expert in police procedures.

b. Mr. Yarchuk is not qualified to give medical, behavioral or accident reconstruction expert testimony and therefore is not capable of rendering an expert medical opinion as to the cause of Ms. Agee's death.

c. Mr. Yarchuk's Affidavit ¶5 is based on speculation and no scientific evidence.

d. Mr. Yarchuk's Affidavit ¶8 was admissible for purposes of the Motion for Summary Judgment hearing, however, provides no proof that Defendant Palmer was involved in harming Ms. Agee.

e. Mr. Yarchuk's Affidavit ¶11-12 experiments lack any scientific, technical, or otherwise specialized knowledge or data and therefore their experiments violated the fifth prong of the *McDaniel* test.[26]

In determining Mr. Yarchuck's areas of expertise, the trial court did not explain either the "police procedures," as to which the court deemed him qualified to express an opinion, or the considerations that rendered him unqualified to express an opinion as to the other matters upon which he opined; neither did the court define the limits of Mr. Yarchuck's ability to express an opinion relative to the evidence he reviewed. The court dismissed paragraphs 11 and 12 without an explanation of the perceived inadequacy of the experiment. Again, to the extent Mr. Yarchuck was not qualified to express an opinion as to those matters which the court struck, it is apparent that the court did not consider the opinions admissible under Rule 701.

---

[26] The fifth prong of the test referred to is "whether the expert's research in the field has been conducted independent of litigation." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997).

Mr. Yarchuk's declaration stated that he has been a law enforcement officer since 2011, a police officer since 2012, a patrolman with the White County Sheriff's Department since 2014 and a detective since 2016. In the stricken portions of paragraphs 4 through 7, Mr. Yarchuck expressed his opinion as to certain physical and circumstantial evidence; as with the other affidavits and declarations, there was no countervailing affidavit as to either Mr. Yarchuk's expertise or opinions, only argument. The stricken opinions were consistent with his experience and training. Similarly, in paragraphs 11 and 12, Mr, Yarchuk describes an experiment he conducted, and the conclusion he reached based on the results of the experiment. As with Mr. Wysocki, the court abused its discretion in striking his opinion; any reservation the court had was, first, not supported by evidence in the record, and second, a matter of the weight to be afforded the results of the test.

### 4. Affidavit of Ryan Melanson

Ms. Palmer moved to strike paragraphs 4 and 6 of Mr. Melanson's affidavit, which stated:

4. On July 26, 2015 after Lauren Agee's body was found, I sat with Aaron Lilly and Christopher Stout on a boat while the DeKalb County Sheriffs officers looked over the campsite where the suspects and Lauren Agee camped. While we engaged in only minimal conversation, Lilly and Stout's general demeanor was not consistent with that of someone who had just been informed of a friend's death, in my experience. They did not express surprise or shock at the victim's death, but rather expressed only nervousness. They expressed no sympathy or concern regarding Lauren Agee's death.

6. Lauren Agee's death was suspicious and the official explanation of her death provided by the DeKalb County Sheriff's department could not have been correct. First, Lauren Agee's body could not have landed in the water had she fallen from the cliff above. This fact is plain from my observation of the cliffside that day. Further, the current at that location was flowing in the opposite direction from where her body was found. Accordingly, even if her body had fallen into the water in some way, it would not have been carried by natural forces to where it was ultimately found. This means her body was moved.

Ms. Palmer argued that the paragraphs should be excluded because:

(a) [The declaration] is not in compliance with this Court's February 24,

2017 Order,[27] (b) Mr. Melanson is unqualified to make the majority of observations and conclusions he made in his Affidavit, where his statements are based upon personal knowledge they exceed the realm of lay opinion testimony, and (c) his methods at arriving at his opinions are unreliable.

Ms. Palmer did not include a countervailing affidavit or declaration in support of her motion.

The trial court agreed and struck the paragraphs, stating:

a. Mr. Ryan Melanson is an expert in law enforcement, however Mr. Melanson is neither a behavioral expert, nor an expert in accident reconstruction.

b. Mr. Melanson's Affidavit ¶ 4 provides improper conclusions and therefore violates Tennessee Rules of Evidence 702 and 703.

c. Mr. Melanson's Affidavit ¶ 6 provides improper conclusions and therefore violates Tennessee Rules of Evidence 702 and 703.

In determining Mr. Melanson's areas of expertise, the trial court did not explain the opinions Mr. Melanson could express as an expert in "law enforcement" or the considerations that the court determined rendered him unqualified to express an opinion as to the matters which were stricken. Again, to the extent the court determined that Mr. Melanson was not qualified to express an opinion as to the matters stricken, the court did not consider the opinions admissible under Rule 701.

As to his qualifications and expertise, Mr. Melanson stated in his declaration:

I have worked in law enforcement since 2006. I have a certificate in law enforcement from Walter State Community College which is one of the most respected law enforcement training facilities in the Southeast. At the time that Lauren Agee died, I was a Sargeant with the White County Sheriff's Department. I continue to work in law enforcement both formally and through private contracts under the commission of the White County Sheriff's Department. I was present during the law enforcement response to the death of Lauren Agee and observed the investigation.

Again, there is no evidence in the record to support Ms. Palmer's argument that, to the extent paragraphs 4 and 6 contained opinions, Mr. Melanson's training and experience

---

[27] This order was not located in the record on appeal.

did not qualify him to express them.

### C. Ms. Palmer's Invocation of her Fifth Amendment Privilege[28]

Ms. Palmer invoked her Fifth Amendment privilege, declining to answer 27 out of 35 allegations of the Complaint; 10 out of 14 interrogatories; all requests for production of documents; 91 out of 100 responses in her deposition on written questions; all requests for admissions; and all of the statements of undisputed material facts put forth by Ms. Smith in response to the motion for summary judgment. In her response to the motion for summary judgment, Ms. Smith argued that "given the evidence in the record in support, an adverse inference that Hannah Palmer committed a tortious act in Tennessee is appropriate." The court declined to draw an adverse inference, holding that there was no corroborating evidence to support the inference. On appeal Ms. Smith argues that this was error; in addition, she argues that, pursuant to Tennessee Rule of Civil Procedure 8.04, the factual allegations of the complaint as to which Ms. Palmer had invoked her Fifth Amendment privilege should had been deemed admitted and summary judgment denied.

### 1. Tennessee Rule of Civil Procedure 8.04

Tennessee Rule of Civil Procedure 8.04 states:

> Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided. Averments in a pleading to which a responsive pleading is required are admitted when not denied in the responsive pleading, except that the following allegations must be proved:
>
> (1) Those against a person under any disability;
> (2) Those against executors or administrators;
> (3) Those necessary to sustain an action for divorce or annulment;
> (4) Those against persons whose names and residences are unknown, where there has been no attachment of property.

---

[28] No person can "be compelled in any criminal case to be a witness against" themselves. U.S. Const. amend. V. While the Fifth Amendment references a criminal case, federal courts have interpreted the Fifth Amendment to extend to any type of proceeding, including civil trials. *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 505-06 (Tenn. 2012) (citing *Lefkowitz v. Turley, 414 U.S. 70, 77, (1973)*; *Kastigar v. U.S.*, 406 U.S. 441, 444, (1972)). The U.S. Supreme Court has deemed the privilege incorporated into the Fourteenth Amendment, and thus made it applicable to the states. *Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

(5) Those against persons whose parental rights are sought to be terminated.

We have not been cited to, nor have we found, Tennessee authority addressing the question of whether the assertion of the Fifth Amendment privilege in an answer filed in a civil case operates as an admission for the purpose of Rule 8.04; it has been addressed in other jurisdictions, and we allow the reasoning in those cases to inform our analysis in this case.

The touchstone federal case on this issue is *Nat'l Acceptance Co. of Am. v. Bathalter*, wherein the court stated the question succinctly: "[t]his case presents the question whether a civil defendant's assertion of his Fifth Amendment privilege against self-incrimination in answer to averments in the plaintiff's complaint may properly be deemed an admission of those averments pursuant to [Federal Rule of Civil Procedure 8(d)]." 705 F.2d 924, 925 (7th Cir. 1983). In that case, the defendant, who had been sued for breach of fiduciary duty, fraud, and unjust enrichment, invoked his Fifth Amendment privilege in responding to the salient allegations of the complaint.[29] *Id.* at 926. The trial court deemed admitted those allegations to which the defendant had asserted the privilege and granted the plaintiff judgment on the pleadings. *Id.* The Seventh Circuit reversed the trial court, drawing upon *Spevack v. Klein* and *Garrity v. New Jersey*, cases in which the Fifth Amendment privilege had been invoked in noncriminal proceedings; the Seventh Circuit held that "[t]reatment of the claim of privilege as an admission would . . . impose too great a cost. . . . [T]here cannot be a general rule that a claim of privilege as to an allegation is to be treated as an admission of it." *Id.* at 932.[30] *See also Mayo v. Ford*, 184 A.2d 38, 40 (D.C. 1962) ("The Fifth

---

[29] In responding to the allegations of the complaint, the defendant stated:

> The subject matter of the complaint has been the basis for at least one [grand jury] investigation conducted by the U.S. Attorney for the Northern District of Illinois, Eastern Division. Exercising his rights under the Fifth Amendment to the Constitution of the United States, defendant respectfully declines to answer any of the remaining allegations of the complaint on the grounds that his answers might tend to incriminate him. Defendant further respectfully requests that such declination have the same procedural effect under Rule 8(d), F. R. Div. P., as if he specifically denied said allegations.

*Nat'l Acceptance Co. of Am. v. Bathalter*, 705 F.2d 924, 926 (7th Cir. 1983).

[30] In *Spevack v. Klein,* 385 U.S. 511 (1967), an attorney had invoked his Fifth Amendment privilege in the course of a disciplinary hearing and was disbarred; on appeal the U.S. Supreme Court held that the Fifth Amendment prohibits the imposition of any sanction which makes the invocation of the privilege "costly." 385 U.S. at 515. In *Garrity v. New Jersey*, 385 U.S. 493 (1967), decided on the same day as *Spevack*, the Supreme Court held that a policeman's testimony at a disciplinary proceeding, which was compelled by the threat of discharge, could not be used in a subsequent criminal proceeding. 385 U.S. at 500. The Court held that the threat of discharge functioned to make the testimony coerced, in violation of the Fifth Amendment. *Id.* at 497-498.

Amendment protection against forced self-incrimination would be meaningless and hollow if the objective sought through the asking of the question could be achieved as well by a refusal to answer as by the answer itself.") In *Rogers v. Webster*, Sixth Circuit adopted the holding of *National Acceptance*:

> We agree with the sense of the Seventh Circuit in *National Acceptance* that, when a defendant in a civil proceeding invokes properly his Fifth Amendment privilege against compulsory self-incrimination in lieu of answering the averments contained in the pleading of his adversary, the District Court should treat his claim of privilege as the equivalent of a specific denial and put the plaintiff to his proof of the matter covered by the "denial."

776 F.2d 607, 611 (6th Cir. 1985). We agree with the rationale and holdings of *National Acceptance* and *Rogers*; applying them to the case before us, we hold that Ms. Palmer's assertion of her Fifth Amendment privilege in answer to the allegations of the complaint cannot, in and of itself, be taken as an admission of the allegations in accordance with Rule 8.04. This holding, however, does not end the inquiry.

As noted in *Rogers*:

> . . . when a defendant in a civil proceeding invokes properly his Fifth Amendment privilege against compulsory self-incrimination in lieu of answering the averments contained in the pleading of his adversary, the District Court should treat his claim of privilege as the equivalent of a specific denial and put the plaintiff to his proof of the matter covered by the "denial." An assertion of the privilege, however, does not give the defendant absolute discretion to circumvent the provisions of Rule 8(d); the person who claims the privilege is not the sole judge of its validity, and, if it clearly appears that he is mistaken as to its justification, the district court may require him to answer.

776 F. 2d at 611 (internal citations omitted). Here, the trial court did not make an independent assessment of the validity of Ms. Palmer's invocation of the privilege as to the specific allegations of the complaint and, if the claim was not valid, allow her the opportunity to admit or deny the allegation; if she then refused to admit or deny the allegation, Rule 8.04 would apply and deem the allegation admitted.[31] On the record

---

[31] The necessity for the court to make such an independent assessment is underscored by the following holding in *Rogers*:

> When the Fifth Amendment privilege is invoked in a judicial proceeding, the person claiming its protection ordinarily "receives a judicial ruling at that time on the validity of his claim, and he has an opportunity to reconsider it before being [penalized] for refusal

before us, there is no motion to deem the allegations of the complaint admitted or asking the court to make a determination of the validity of the claim as to specific allegations. Upon proper motion being filed, the court should make such a determination.

## 2. Negative Inferences

Courts have recognized that, in a civil proceeding where the parties are on a "somewhat equal footing" and one of the parties invokes his or her Fifth Amendment privilege, the invocation of the privilege "'should not obliterate another party's right to a fair proceeding.'" *Akers v. Prime Succession of Tennessee, Inc.*, 387 S.W.3d 495, 506 (Tenn. 2012) (quoting *Serafino v. Hasbro, Inc.*, 82 F.3d 515, 518 (1st Cir. 1996)). In addressing the parties' competing interests, courts have allowed the trier of fact to invoke adverse inferences against the party invoking the privilege in certain circumstances. *See Akers*, 387 S.W.3d at 506.[32] In *Akers*, our Supreme Court "agree[d] with the standard adopted by *Doe* [*ex rel. Rudy-Glanzer v. Glanzer,* 232 F.3d 1258]" and held:

> [T]he trier of fact may draw a negative inference from a party's invocation of the Fifth Amendment privilege in a civil case only when there is independent evidence of the fact to which a party refuses to answer by invoking his or her Fifth Amendment privilege. In instances when there is no corroborating evidence to support the fact under inquiry, no negative inference is permitted.

387 S.W.3d at 506. Before an adverse inference is permitted:

> A plaintiff must present corroborating evidence regarding *the specific fact* to which the defendant refuses to answer. In determining whether a negative inference is permissible, the privilege analysis is applied on a question-by-question basis, and "therefore . . . the privilege necessarily attaches *only to the question being asked and the information sought by that particular question*."

---

to answer." Not affording one who asserts the privilege an opportunity to answer, once his claim of privilege has been rejected, is to penalize him merely for asserting the privilege.

776 F.2d at 612 (internal citation omitted).

[32] *See also Levine v. March,* 266 S.W.3d 426, 442 (Tenn. Ct. App. 2007) ("[T]he majority of jurisdictions, including Tennessee, permit fact-finders to draw adverse inferences against parties who invoke their Fifth Amendment rights in a civil case."); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) ("[N]ot allowing the negative inference to be drawn poses substantial problems for an adverse party who is deprived of a source of information that might conceivably be determinative in a search for the truth.").

*Id.* at 506-07 (quoting *Doe*, 232 F.3d at 1265) (citations omitted) (emphasis in *Akers*).

In this case, the trial court acknowledged that Tennessee law allows a jury to draw a negative inference from Ms. Palmer's refusal to answer questions about Ms. Agee's death; the court held that "the Plaintiff has failed to produce any evidence that Defendant Palmer either intentionally, negligently, or recklessly caused any harm to Ms. Agee," that "[n]o evidence has linked anyone to Ms. Agee's death or shown what further investigation would have discovered," that "no evidence corroborates the facts supporting the inquiry in civil cases, pursuant to Akers," and that, even if everything the experts' affidavits were taken as true, it would not be enough to get a negative inference ruling against the defendant Palmer."

Our resolution of this issue is complicated by the fact that the court's ruling as to any negative inference was done in the context of considering the summary judgment motion and materials. As noted in the quote above, *Akers* allows that the plaintiff should be afforded the opportunity to present corroborating evidence as to each fact for which it seeks a negative inference; this was not done in this case, inasmuch as plaintiff was responding to summary judgment. As a result, the trial court determined the issue or negative inference as a blanket matter, weighing evidence and determining that Ms. Smith was not entitled to a negative inference as to any fact for which the privilege was asserted; the court used an incorrect analysis in its decision.

On remand, if presented with the question of whether the Ms. Smith is entitled to a negative inference, the trial court should analyze the specific fact and determine whether there is independent, corroborating evidence of that fact. Further, the trial court is the ultimate arbiter of the Fifth Amendment privilege; "[i]t is for the court to say whether his silence is justified," and the court has the power to compel an answer from one invoking the Fifth Amendment privilege "if 'it clearly appears to the court that [person invoking the privilege] is mistaken.'" *Hoffman v. United States*, 341 U.S. 479, 486 (1951) (quoting *Temple v. Commonwealth*, 75 Va. 892, 899 (Va. 1881)); *see also Rogers v. Webster*, 776 F.2d 607, 611 (6th Cir. 1985).[33]

### D.    Ms. Palmer's Claim for Damages for the Appeal

Ms. Palmer asserts that this appeal is frivolous and seeks an award of damages pursuant to Tennessee Code Annotated section 27-1-122.[34] To find an appeal frivolous,

---

[33] "[G]iven the tension between the rights of both parties in civil matters, the United States Supreme Court has ruled that the trier of fact may under certain circumstances be allowed to draw adverse inferences from a party's invocation of his Fifth Amendment privilege." *Akers*, 387 S.W.3d 505-06.

[34] Tennessee Code Annotated section 27-1-122 states:

When it appears to any reviewing court that the appeal from any court of record was

28

the appeal must be wholly without merit and lacking in justiciable issues. *See Davis v. Gulf Ins. Group*, 546 S.W.2d 583, 586 (Tenn. 1977); *Indus. Dev. Bd. of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995). An appellate court's decision on this issue is discretionary, and this court is generally reluctant to award such damages because we do not want to discourage legitimate appeals. *Whalum v. Marshall*, 224 S.W.3d 169, 180-81 (Tenn. Ct. App. 2006). Exercising our discretion, and in light of the resolution of the issues in this appeal, we deny the request.

## III.   CONCLUSION

For the foregoing reasons, we reverse the grant of summary judgment, vacate the rulings on the motions in limine that are at issue in this appeal, vacate the holdings relative to defendant's invocation of her Fifth Amendment privilege, and remand the case for further proceedings consistent with this opinion.

---

RICHARD H. DINKINS, JUDGE

---

frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.