IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2021

**IN RE JACKSON H.**

**Appeal from the Juvenile Court for Giles County**
**No. JV-690    Robert C. Richardson, Jr., Judge**

---

**No. M2020-01551-COA-R3-PT**

---

The trial court terminated a father's parental rights to his child on the grounds of (1) persistence of conditions, (2) failure to manifest an ability and willingness to personally assume custody or financial responsibility, (3) substantial noncompliance with the permanency plan, and (4) abandonment by wanton disregard. The trial court also found that termination of the father's parental rights was in the child's best interest. Although we reverse three of the termination grounds, we affirm the trial court's conclusion that clear and convincing evidence supports a finding of abandonment by wanton disregard. We also affirm the trial court's determination that the termination of the father's parental rights is in the best interest of the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Reversed in Part, Affirmed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which ANDY D. BENNETT, J., joined, and J. STEVEN STAFFORD, P.J., W.S., filed a separate dissenting opinion.

Mattea L. Rolin, Elkton, Tennessee, for the appellant, Joshua H.

Herbert H. Slatery, III, Attorney General & Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Jessica Sloan Elam, Columbia, Tennessee, Guardian *ad litem*.

# OPINION

## I.  BACKGROUND

Jackson H. ("child") was born in April 2016 during the marriage of Joshua M.H. ("Father") and his then-wife ("Mother").  Mother surrendered her parental rights to the child in June 2020.  She is not participating in this appeal.

On June 6, 2016, Lieutenant Hunter of the Giles County Sheriff's Department filed a petition alleging that the child was dependent and neglected.  Specifically, the petition alleged that around May 15, 2016—when the child was a newborn—Father "held the [child] upside down by both feet and threatened to drop [him] if [Mother] did not take photos of two girls (age 10 + 11) in the nude including their genital area."  Mother allegedly took the photos, "which included photos of their [genitals]," and "gave the photos to Father, who then [used the photos for inappropriate purposes]."  Lieutenant Hunter further alleged that "Father is a convicted violent sex offender," was "in custody," and "ha[d] a bond of $720,000.00."  Based on the allegations, the juvenile court ("trial court") ordered that the child be placed in the custody of the Tennessee Department of Children's Services ("DCS").  Through counsel, Father waived the preliminary hearing.  On July 12, 2016, the trial court found as follows:

> Upon stipulation of the parties, the court finds by clear [and] convincing evidence that the child is dependent and neglected as alleged in the petition.  Father makes no stipulation as to [the] allegations in [the] petition being true or false.  But [Father] [] make[s] a best interest stipulation as to the child's [dependency and neglect] and factually admits he is currently incarcerated.

The trial court ordered the child to remain in DCS's custody and ordered that Father have no contact with the child, pending further hearing.  DCS developed two permanency plans dated July 2016 and September 2017.  Under both plans, Father was required to contact DCS within three days of his release from prison.  Both permanency plans were ratified and received by Father.

On October 8, 2018, DCS petitioned to terminate Father's parental rights to the child.  The termination proceedings were stayed pending resolution of a petition for custody and adoption filed in chancery court by the child's grandparents.  The chancery court dismissed the grandparents' petition.  Father answered DCS's petition on July 8, 2020.  After two continuances, the case proceeded to trial on September 4, 2020.  Father,

Foster Father, and then-family service worker Savannah Boshers testified.[1]  The child was then four years old, and a guardian *ad litem* represented his interests.  Three significant facts were established by the undisputed evidence at trial and are also conceded on appeal: (1) the charges against Father pursuant to state criminal statutes were dismissed; (2) a federal grand jury returned an indictment charging Father with one or more crimes under certain federal statutes; and (3) at the time of trial, Father was incarcerated in a federal prison pending further proceedings on the federal criminal charge(s).[2]

By order entered October 20, 2020, the trial court found clear and convincing evidence of the following grounds for termination: (1) persistence of conditions, (2) failure to manifest an ability and willingness to personally assume custody or financial responsibility, (3) substantial noncompliance with the permanency plan,[3] and (4) abandonment by exhibiting a wanton disregard for the child's welfare.  The trial court also determined that termination of Father's parental rights was in the best interest of the child.  Father appealed.


## II.    ISSUES

On appeal, Father raises one issue: "were the statutory requirements for termination of [Father's] rights met and was it in the best interest of the minor child to terminate said parental rights."  In the posture of appellee, DCS raises as an issue whether this court "should take judicial notice of the certified federal court documents regarding Father's criminal charges."


## III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988).  This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004).  "Termination of a person's

---

[1] The testimony will be discussed in greater detail below as relevant to the issues on appeal.

[2] Father participated in the trial by telephone.

[3] In its petition, DCS did not allege against Father the ground of substantial noncompliance with the permanency plan.  Upon DCS's motion at trial and pursuant to Tennessee Rule of Civil Procedure 15.02, the trial court permitted amendment of the petition to conform to the evidence.

rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1)     [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W. 3d 662, 680 (Tenn. 2017).

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "Thus, this court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.    DISCUSSION[4]

1.

We will first address the issue raised by DCS. DCS urges this court to consider certified copies of certain filings from Father's federal district court proceedings. The filings are presented in a 30-page appendix to DCS's appellate brief. This court "may consider those facts established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to Rule 14." Tenn. R. App. P. 13(c). DCS acknowledges that the federal court filings

---

[4] We will reference the statutes which were in effect when DCS filed the petition for termination of parental rights in October of 2018.

were not introduced as evidence at trial and, therefore, cannot be included in a supplemental record under Tennessee Rule of Appellate Procedure 24(e). Most of these filings are dated 2019, nearly a year preceding the trial and judgment in this matter, so DCS further concedes that they cannot be considered pursuant to Rule 14. *See* Tenn. R. App. P. 14 (setting forth procedure by which the appellate courts "may consider facts concerning the action that occurred after judgment."). Instead, DCS requests that we take judicial notice of all of the facts contained in the various federal court filings. DCS's argument on this issue is unpersuasive, particularly in light of DCS's choice not to introduce certified copies of the federal court filings for the trial court's consideration. Moreover, "[w]e cannot take judicial notice of materials appended to briefs that are not properly part of the record on appeal." *Willis v. Tennessee Dep't of Correction*, 113 S.W.3d 706, 713 n.6 (Tenn. 2003) (declining to take judicial notice of a disciplinary infraction report attached to an appellate brief but not introduced in the trial court). In addition, the filing dated December 3, 2020, is post hoc evidence irrelevant to our review of the trial court's factual findings and legal conclusions in the case at bar.

2.

Next, we must address a concern about the trial court's order terminating parental rights. Throughout its petition, DCS listed specific federal criminal statutes as well as corresponding mandatory minimum sentences. DCS's petition alleged that Father was charged with crimes pursuant to these statutes and was "awaiting trial" on the charges. During the trial on the petition to terminate parental rights, the trial court instructed Father that he could assert the "Fifth Amendment privilege at any time if the question infringes on what is potentially a harmful aspect to [the federal district court proceedings]." The trial court further instructed, "anytime that you assert that Fifth Amendment privilege, though, I can infer from that what I want to." This was a proper instruction because in civil cases, the trier of fact may draw a negative inference from a party's invocation of the Fifth Amendment if there is independent evidence of the fact to which a party refuses to testify. *Akers v. Prime Succession of Tennessee, Inc.*, 387 S.W.3d 495, 506 (Tenn. 2012). Our Supreme Court has held that the negative inference may be drawn "*only* when there is independent evidence of the fact to which a party refuses to answer by invoking his or her Fifth Amendment privilege. In instances when there is no corroborating evidence to support the fact under inquiry, no negative inference is permitted." *Id.* (emphasis added). The Fifth Amendment "privilege attaches only to the question being asked and the information sought by that particular question." *In re Alfonzo*, No. M2016-00867-COA-R3-PT, 2016 WL 6299492, at *5 (Tenn. Ct. App. Oct. 26, 2016) (citing *Akers*, 387 S.W.3d at 507). "Consequently, a negative inference is only available on a question-by-question basis." *Id*. (citing *Akers*, 387 S.W.3d at 506–07).

Father invoked his Fifth Amendment privilege against self-incrimination in response to these questions:

Q. What are your federal charges right now?

Q. Is your first count conspiracy to produce child pornography?

Q. Are counts 2 through 10 production of child pornography?

Q. Count 11 is possession of child pornography?

Q. If you pled to the charges that you have right now, what is the minimum sentence that you could be facing?

Q. It could be 15 years?

Q. Could it be 100 years?

Q. If it was a minimum of a 15-year sentence and this child is now four years old, this child would be 18 before you'd have a chance to get out[,] right?

Q. Those charges in Alabama making you a sex offender, don't those tend to make these federal charges a little bit worse for you?

Q. Don't those enhance what can happen to you with those federal charges?

Q. Are you going to be incarcerated for the near future?

DCS's trial counsel requested the trial court to draw a negative inference from Father's invocation of the Fifth Amendment in response to all of these questions, but it is unclear from the transcript which assertions of Fifth Amendment privilege by Father were given a negative inference. The trial court's order does not state whether the trial court drew a negative inference from Father's response to any of these questions or to any other question. Even if the trial court had drawn a negative inference from Father's response to the above questions, it would constitute error because the record before us contains no independent evidence of the facts about which DCS's trial counsel inquired in its questioning of Father. *See Akers*, 387 S.W.3d at 506. The only evidence before the trial court on this general subject was offered through the testimony of Ms. Boshers:

Q. How long has [Father] been in custody? Incarcerated, rather?

A.  To my knowledge, it's been since June of 2016.

. . .

Q.  Is [Father] in a position now to have custody of his child?

A.  No, he's not.

Q.  Why?

A.  He is still incarcerated with an unknown time of being released from jail.

When asked about the "current[]" charges against Father, Ms. Boshers responded, "I know there is [*sic*] child pornography charges," but she did not specify what the charges were.  Ms. Boshers asserted that prior to incarceration "[Father] was already a sex offender in Alabama."  On cross examination, Father's counsel questioned whether Ms. Boshers knew "what the charges were [against Father] in Alabama."  Ms. Boshers stated, "It was inappropriate contact with a minor."  Ms. Boshers advised, "we are not aware" if and when Father would be released from incarceration.  Notably, upon Father's objection, the trial court excluded testimony regarding the possible length of a prison sentence if Father were to be convicted of "those charges."  Such testimony was excluded on the bases of speculation and hearsay.

As mandated, we have reviewed carefully the trial court's findings on each ground for termination.  *In re Carrington H.*, 483 S.W.3d at 525–26 ("the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").  Our goal is to "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures."  *Id*. at 525.  Regrettably, the findings of fact supporting the termination ground of persistence of conditions[5] and the ground of failure to manifest an ability and willingness to personally assume custody or financial responsibility[6] contain facts not in evidence, as well as blatant misstatements of the testimony.  For instance, on the ground of persistence of conditions, the trial court found:

---

[5] Tenn. Code Ann. § 36-1-113(g)(3)(A).

[6] Tenn. Code Ann. § 36-1-113(g)(14).

[Father] testified that he has been incarcerated since June 3, 2016 . . . .[7] [Father's] testimony at trial showed, if convicted of his pending child pornography charges, that he may have a federal sentence as short as 15 years and as long as 100 years. The sentences are mandatory without the possibility of parole. [Father's] status as a registered sex offender in Alabama will enhance his federal sentence, provided he is convicted. If [Father] received the shortest possible sentence, the child will reach majority long before [Father] is released . . . . [Father's] release is unlikely in the near future.

Similarly, on the ground of failure to manifest an ability and willingness to personally assume custody or financial responsibility, the trial court found, "[Father] is awaiting sentencing. If convicted as charged, there is undisputed evidence that [he] will have a total effective, minimum sentence of 15 years and a maximum sentence of 100 years for child pornography charges."

Again, Father asserted his Fifth Amendment privilege against self-incrimination in response to questions about specific federal criminal charges, the possible range of sentence, the possibility of parole, and potential aggravating factors. Nor does the record contain independent evidence of these facts. The trial court specifically excluded from evidence Ms. Boshers' speculative testimony on the possible length of any sentence of incarceration, and the aforementioned factual information did not come in through the testimony of another witness. Because there is no evidentiary support *in the record* for the foregoing factual findings, they are reversed. We have determined that there is not clear and convincing evidence sufficient to prove the grounds of persistence of conditions, Tenn. Code Ann. § 36-1-113(g)(3)(A), and failure to manifest an ability and willingness to personally assume custody or financial responsibility, Tenn. Code Ann. § 36-1-113(g)(14). Accordingly, we reverse the trial court's judgment terminating Father's parental rights based upon these two grounds.

It bears noting that DCS's trial counsel prepared the order terminating Father's parental rights. In the process, mere allegations (such as mandatory minimum sentences and aggravating factors pursuant to certain federal child pornography statutes), evidence ruled inadmissible, and facts that DCS failed to prove at trial were inserted as the trial court's independent findings. We encourage DCS to review this court's and the Tennessee Supreme Court's guidance on party-prepared orders. *See, e.g.*, *Smith v. UHS of Lakeside, Inc*., 439 S.W.3d 303 (Tenn. 2014); *In re Nathan C*., No. E2019-01197-COA-R3-PT, 2020 WL 730623 (Tenn. Ct. App. Feb. 12, 2020); *In re Colton B*., No. M2017-00997-COA-R3-PT, 2017 WL 6550620 (Tenn. Ct. App. Dec. 22, 2017).

---

[7] Father did not so testify, but this fact was established through the testimony of Ms. Boshers.

### 3.
*Substantial Noncompliance with the Permanency Plan*

A court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). In terminating parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H*., No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "The trial court must then find that the noncompliance is substantial." *Id*. (citation omitted). Although the termination statute does not define what conduct constitutes substantial noncompliance, the significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548.

Here, the trial court found that Father's responsibility under the permanency plan was to contact DCS within three days of his release from prison. The court further found that "the responsibilities under the plan were reasonable and related to remedying the conditions that led to the child being placed in foster care[,] and in the child's best interest." The court concluded that Father's "failure to be released from incarceration constitutes substantial noncompliance," and terminated Father's parental rights for this reason. On appeal, DCS does not defend the trial court's findings on this ground for termination. Citing *In re Ke'Andre C*., DCS concedes that because Father's sole task pursuant to the permanency plan cannot be completed until Father is actually released from prison, his incarceration was effectively a complete barrier to fulfilling the plan's requirements. *In re Ke'Andre* C., No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *9 (Tenn. Ct. App. Jan. 29, 2018) (reasoning that "incarceration does not relieve a parent of their responsibilities to their children," but reversing finding of substantial noncompliance with a permanency plan under factual scenario where terminating a father's rights on that ground "would be tantamount to terminating his parental rights solely based on his incarceration"); *see also In re Jonathan F*., No. E2014-01181-COA-R3-PT, 2015 WL 739638, at *13 (Tenn. Ct. App. Feb. 20, 2015) (cautioning courts "to avoid making incarceration solely on its own into a de facto ground for termination").

Considering the foregoing and based upon our review of the record, we have determined that the evidence is not sufficient to prove the ground of substantial noncompliance with the permanency plan. Accordingly, we reverse the judgment of the trial court terminating Father's parental rights on the ground of substantial noncompliance with the permanency plan.

*Abandonment by Wanton Disregard*

Parental rights may be terminated for abandonment, as defined in Tennessee Code Annotated section 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). As relevant here, abandonment can be found when a parent who is incarcerated when the termination petition is filed "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). The relevant pre-incarceration period for conduct exhibiting wanton disregard referred to in section 36-1-102(1)(A)(iv) "is not limited to acts during the four-month period immediately preceding the incarceration." *In re Jeremiah T.*, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at *8 (Tenn. Ct. App. Apr. 30, 2009) (citing *In re Audrey S.*, 182 S.W.3d at 871).

"Wanton disregard" is not a defined term, but this court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68 (citations omitted). Tennessee Code Annotated section 36-1-102(1)(A)(iv) represents the General Assembly's "commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and that "[i]ncarceration severely compromises a parent's ability to perform his or her parental duties." *In re Audrey S.*, 182 S.W.3d at 866. "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015).

The trial court's order terminating Father's parental rights included the following findings:

> Pursuant to § 36-1-113(g)(1) and 36-1-102(1)(A)(iv) the Court finds clear and convincing evidence that [Father] is a parent of [the child] subject of the petition for termination of parental rights. Further, the Court concludes that [Father] engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. [Father] was incarcerated at the time the petition to terminate parental rights was filed and all of the four (4) months immediately preceding filing of the Petition.
>
> . . .

The *In RE Audrey S.* examples of conduct that demonstrate wanton disregard are applicable here for criminal behavior . . . and adequate supervision. Ms. Boshears [*sic*] testified that [Father] threatened to drop the child on his head. [Father] demonstrated wanton disregard by acting criminally and was not adequately supervising the child.

Father does not directly challenge the trial court's findings on this or any other ground. Instead, he references a ground for termination which was neither alleged by DCS nor found by the trial court. Upon our review, we find that the evidence in the record does not preponderate against the trial court's factual findings. Ms. Boshers' testimony established that Father has been twice incarcerated, once in the Giles County Jail and, at the time of trial, in a federal prison. He has been continuously incarcerated since June 2016. This fact alone does not establish wanton disregard, *In re Audrey S.*, 182 S.W.3d at 866, but Father's repeated incarcerations taken together with his pre-incarceration actions demonstrate an inability to adequately supervise or to provide a safe and stable environment for the child. For example, Ms. Boshers testified:

Q. Do you also know if the child was removed by an order from the Giles County Juvenile Court?

A. He was.

Q. Was that order entered as a result of a petition filed by DCS?

A. Yes, it was.

Q. Do you know if that petition alleged dependency and neglect as to [the child]?

A. It did.

Q. What were those allegations in that dependency and neglect petition?

A. The allegations were that [Father] was going to drop [the child] on his head if [Mother] did not take pictures of the girls that lived next door.

Father's counsel did not object to this line of questioning. At the time of the dependency and neglect proceedings, Father made "no stipulation as to [the] allegations in [the] petition being true or false." Since then, Father has not affirmatively denied that he held his newborn son upside down and threatened to drop the child on his head unless Mother provided explicit photos of minor children. Father's counsel challenged Ms. Boshers'

- 12 -

testimony on these facts only by questioning whether Ms. Boshers knew if Mother was the informant who made the foregoing allegation to the Giles County Sheriff's Department. Ms. Boshers stated, "I don't recall reading that, no, ma'am."

We find no error in the trial court's determination that there was clear and convincing evidence supporting the termination of Father's parental rights for abandonment by wanton disregard. Accordingly, we affirm the trial court's judgment terminating Father's parental rights on this ground.

*Best Interest of the Child*

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must consider whether termination was in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. In making this determination, we are guided by the following non-exhaustive list of factors:

> (i)     In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> >
> > (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> >
> > (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> >
> > (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In making the best interest determination, the trial court relied on Father's years-long lack of contact with the child, Father's lack of a meaningful relationship with the child, his lack of support for the child, and the effect on the child if he were to be removed from the foster parents' home. *See* Tenn. Code Ann. § 36-1-113(i)(3), (4), (5), & (9). At trial, Father stated that he had not seen the child since June 3, 2016. Father has not supported the child since he was approximately two months old. When asked how much money he earns while incarcerated pending further federal court proceedings, Father advised, "I don't make any money but I receive money . . . I was left an inheritance." When questioned why he had not paid support for the child, Father reasoned, "I was never ordered." However, "[e]very parent who is eighteen (18) years of

- 14 -

age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Tenn. Code Ann. § 36-1-102(1)(H). Furthermore, this court has "declined to conclude that parents' failure to support was excused by the absence of a court order requiring them to do so." *In re Sydney B.*, 537 S.W.3d 452, 459 (Tenn. Ct. App. 2017) (citing *In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *20 (Tenn. Ct. App. June 17, 2015)).

Overall, the evidence does not preponderate against the trial court's factual findings on the statutory factors. Because Father failed to support the child despite receiving inheritance money, the trial court properly found that this factor favored termination as to the best interest of the child. The testimony clearly and convincingly shows that, by the time of trial, the foster parents had been the child's caregivers for nearly four years. The child calls Foster Father "daddy," just as Foster Father and his relatives treat the child as their own. The child is strongly bonded to Foster Father who wishes to adopt him. As the trial court found, the foster parents "are the only caregivers that the child has ever known." On this point, the guardian *ad litem* questioned Father:

> Q. What type of effect do you think it would be for your child to be removed from the only home he's ever known for four years to be placed with complete strangers to him who know nothing about him?
>
> A. [The child] is at a young age. He's four years old. His brain is like a sponge. He can reprogram at any given time and still have a loving bond with his father.

We, like the trial court, are not persuaded that the child can simply "reprogram." The child is thriving in his current environment. The child does not know Father as his father, and there is no evidence that there is any bond between Father and the child. A change of caretakers at this point in the child's life would be emotionally and psychologically detrimental or, as stated in Foster Father's unchallenged testimony, "[i]t would pretty much destroy [the child's] world." Tenn. Code Ann. § 36-1-113(i)(5). Based on these facts and the record as a whole, we conclude that clear and convincing evidence supports a finding that termination of Father's parental rights is in the child's best interest. Accordingly, we affirm the trial court.

## V.     CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part. The termination of Joshua H.'s parental rights is affirmed. The case is remanded for such

- 15 -

further proceedings as may be necessary and consistent with this Opinion.  Costs of the appeal are taxed to the appellant, Joshua H., for which execution may issue if necessary.

_____
JOHN W. McCLARTY, JUDGE